62 Cal.App.4th 23 (1998)
In re ASHLEY P. et al., Minors.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent,
v.
NICHOLAS P. et al., Defendants and Respondents; PATRICIA B., Movant and Appellant.
Docket No. B111890.
Court of Appeals of California, Second District, Division Five.
March 12, 1998.
*25 COUNSEL
Nancy Kelso, under appointment by the Court of Appeal, for Movant and Appellant.
De Witt W. Clinton, County Counsel, Emily Dentzer and Gary Gross for Plaintiff and Respondent.
No appearance for Defendants and Respondents.
OPINION
ARMSTRONG, J.
This case involves two children, Ashley and Chelsea, who were nine years old and five years old when a dependency petition was filed in April of 1995. Their parents were divorced. The family court orders are not in our record, but it seems that the children spent alternate weeks with each parent. The mother, Patricia P., had had brain surgery and had ongoing problems. The father, Nicholas P., had agreed that Patricia P.'s mother, Patricia B., appellant here, could take care of the children if Patricia P. could not.
The Los Angeles County Department of Children and Family Services (DCFS) became involved with this family when police officers observed Patricia P. attempt to drive while under the influence, with Chelsea in the car. Patricia P. was placed on a mental health hold, the children were taken to appellant's home, and the dependency petition was filed.
Both parents pled no contest to the petition. In particular, the children's mother pled no contest to a charge that her medical problems and substance abuse rendered her periodically unable to care for the children, and Nicholas P. pled no contest to a negotiated charge that he was unable to care for his children "due to work pressures." Jurisdiction was asserted under Welfare and Institutions[1] Code section 300, subdivision (b)[2] and the children were placed with appellant full time.
*26 The children lived with appellant for two years, safely, happily and with the approval of the DCFS and the court. A section 366.22 hearing was held in October of 1996. Apparently by stipulation, the court found that return of the children to either parent would create a substantial risk of detriment to their well-being. Guardianship with appellant was identified as the permanent plan, and a section 366.26 hearing was set.
However, in March of 1997, Nicholas P. filed a petition under section 388, seeking custody. He had remarried and wanted to live with his children. His petition also recounted complaints against appellant: She castigated him for not being a good father, was not cooperative when he sought longer visits, and disparaged him to the children.
Appellant filed a petition for de facto parent status. She described her efforts on behalf of the children and made negative comments about Nicholas P.
The hearing on the de facto parent petition, the hearing on the section 388 petition, and the section 366.26 hearing were held concurrently on March 28, 1997. (During the hearing, the court essentially deemed the section 366.26 hearing a section 366.22 hearing.) For this hearing, DCFS reported that appellant (and other maternal relatives) were causing "emotional damage to the father/daughter relationship" by disparaging Nicholas P. to the children, and were "thwarting family reunification." (Reunification had never been the identified case goal.) DCFS recommended that the de facto parent petition be denied, that the section 388 petition be granted, and that if the court did not place the children with Nicholas P., they be put in foster care.
The court heard evidence from the children, appellant, and a social worker. The children and their mother supported appellant's petition for de facto parent status, but the court denied the motion, finding that appellant had at least indirectly "thwarted the case plan and turned the children against the father." The court further found that appellant did not see the children's psychological needs and was not meeting those needs.
The court also denied the section 388 petition, but ordered the children into foster care forthwith, with only monitored visits with appellant. The court also ordered psychological evaluations of both parents, both children, and appellant, if she wished to be included. New DCFS reports were ordered and further hearings set.
(1a) Appellant challenges the court's denial of her petition for de facto parent status. We agree with appellant that on this record, she should have been accorded de facto parent status, and reverse that order.
*27 (2) Under California Rules of Court, rule 1401(a)(4), a de facto parent is "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period."
"The de facto parenthood doctrine simply recognizes that persons who have provided a child with daily parental concern, affection, and care over substantial time may develop legitimate interests and perspectives, and may also present a custodial alternative, which should not be ignored in a juvenile dependency proceeding." (In re Kieshia E. (1993) 6 Cal.4th 68, 77 [23 Cal. Rptr.2d 775, 859 P.2d 1290].)
Among the factors to be considered in determining whether a person falls within the definition of a "de facto parent" are whether the child is psychologically bonded to the adult; whether the adult has assumed the role of a parent on a day-to-day basis for a substantial period of time and possesses information about the child unique from the other participants in the process; whether the adult has regularly attended juvenile court hearings; and whether a future proceeding may result in an order permanently foreclosing any future contact with the adult. Above all, the decision depends on the particular individual seeking such status and the unique circumstances of the case. (In re Patricia L. (1992) 9 Cal. App.4th 61, 66-67 [11 Cal. Rptr.2d 631].)
As several courts have observed, the juvenile court can only benefit from having all relevant information bearing on the best interests of the child, and de facto status should be liberally granted. (In re Hirenia C. (1993) 18 Cal. App.4th 504, 514 [22 Cal. Rptr.2d 443]; In re Patricia L., supra, 9 Cal. App.4th at p. 67.) "The simple fact that a person cares enough to seek and undertake to participate goes far to suggest that the court would profit by hearing his views as to the child's best interests...." (In re B.G. (1974) 11 Cal.3d 679, 692, fn. 18 [114 Cal. Rptr. 444, 523 P.2d 244].)
(1b) Here, appellant provided loving care to the children for a long period of time. They had strong and positive psychological bonds with her. From the initiation of the dependency until March of 1997, DCFS reported that appellant was providing a loving and appropriate home and that the children loved appellant and wanted to live with her. No report includes any criticism of appellant whatsoever.
As their caretaker, appellant had special information about the children. She seems to have brought the children to the court appearances, although *28 she was not allowed to be present during most of those hearings, since she was not a party. The fear that she could be deprived of contact with the children  and they deprived of contact with her  is precisely what has brought her here.
Appellant thus more than met her burden of showing that she was entitled to de facto parent status. The unique circumstances of this case are simple: Appellant provided a home for these children when their parents were unable or unwilling to do so. As their caretaker, she amply provided for all their needs.
De facto parent status was denied to appellant on the ground that she had thwarted reunification of the children with Nicholas P., and on the grounds that she had "turned the children against their father," did not understand the children's psychological needs, and had not cared for those needs.
The notion that appellant had "thwarted reunification" may be quickly dismissed. Reunification with either parent was never a case goal. Appellant violated no court order,[3] and did nothing to frustrate any goal announced by the court.
As to the second ground, we find no evidence that appellant caused these children psychological harm or failed to attend to their psychological needs. We examine the evidence before the court.
First, in reports filed after Nicholas P.'s section 388 petition, DCFS indicated for the first time that Nicholas P. and appellant had long complained of each other to DCFS. The DCFS case worker believed that appellant had made negative statements about Nicholas P. to and/or in front of the children, and that the "entire maternal family" had caused emotional damage to the father-daughter relationship. The de facto parent petition, the section 388 petition, DCFS reports, and testimony at the hearing make it clear that the disputes between appellant and Nicholas P. concerned such things as the amount and timeliness of Nicholas P.'s child support payments, the frequency of Nicholas P.'s visits with the children, his parenting skills, and appellant's alleged lack of cooperation when, at about the time of his second marriage, Nicholas P. sought longer visits.
DCFS Social Worker Jerry Boyd testified at the hearing. He was asked for the basis of DCFS's opposition to appellant's petition for de facto parent *29 status. His answer was stricken as nonresponsive, but it was sufficiently illuminating that we note it here: "Well, first of all, legally, I'm not sure what that means; however these children have two parents. They're both here, so I'm not sure what de facto parent means. [Nicholas P.] is seeking custody of his children and we concur in that."
As evidence that the children had suffered emotional damage in terms of their relationship with Nicholas P., Boyd testified that the children "parroted" the complaints about Nicholas P. that their mother and grandmother made. It seemed to Boyd that the children blamed Nicholas P. for all of their mother's and grandmother's problems. Boyd had heard appellant discuss the dependency case in front of the children. During telephone conversations with appellant, Boyd had heard her make derogatory comments about Nicholas P., but he did not know if the children were present.
The court also had before it the report of a therapist who saw both children with their father and stepmother in two sessions just prior to the hearing on de facto parent status. The report contains no indication that the children were negatively influenced in any way by appellant, or that appellant attempted to so influence them.
Both children testified at the hearing. Both testified that they preferred to live with their grandmother and did not want to live with their father. Both testified that their dislike of their father was based on their own feelings, his behavior, and their memories of their parents' marriage.[4]
On this record, there is no evidence that appellant misunderstood the psychological needs of the children or failed to provide any care. There was no evidence she attempted to, or did, influence the children against their father or undermine their feelings for him. Boyd speculated that the children's complaints about their father were not genuine, but speculation is not evidence. Further, Boyd was vague on whether the "parroted" statements originated with appellant or with other members of the maternal family. Of course, anything another relative may have said or done cannot be held against appellant.
At worst, the children were aware of disputes between their grandmother and their father. This can hardly be an unusual situation in families, especially ones which have undergone divorce. DCFS seems to assume that this *30 awareness was psychologically unhealthy for the children, but there is no expert testimony to that effect in the record, and we are aware that many people believe that airing differences is a healthier tactic than hiding them. Similarly, the fact that appellant discussed the dependency case with the children is hardly evidence of lack of psychological care. The children were frequently interviewed by social workers and were fully aware that, as Ashley once complained, "the court controls our lives." An explanation to children of the real and powerful forces in their lives can hardly be deemed per se harmful, and there is nothing in the record to indicate that it was harmful in this case.
We note, too, that both children were under the care of therapists during most of the dependency, and that appellant supported this treatment, taking the children to the appointments.
The court thus erred in denying appellant's motion for de facto parent status, and we reverse that ruling.
At oral argument, appellant informed us that dependency jurisdiction in this case has terminated.[5] Appellant also clarified her position in light of these changed circumstances: Her concern is that the trial court finding against her on the question of de facto parent status could be later used, in family law or other proceedings, to limit or deny her visits with her grandchildren. We thus need not and do not reach the second issue raised in appellant's brief, the issue of the removal of the children from her care in March of 1997.

Disposition
The order denying de facto parent status to appellant is reversed.
Turner, P.J., and Grignon, J., concurred.
NOTES
[1] All further statutory references are to that code.
[2] That section provides that a minor comes within the jurisdiction of the juvenile court if "The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the minor, or the willful or negligent failure of the minor's parent or guardian to adequately supervise or protect the minor from the conduct of the custodian with whom the minor has been left.... The minor shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the minor from risk of suffering serious physical injury or illness." (§ 300, subd. (b).)
[3] At the hearing, much was made of the fact that appellant had allowed overnight visits between the children and their mother, contrary to court order. It is not entirely clear from the record that overnight visits were contrary to an order of the court, but it is clear that appellant was never told of any such order.
[4] Ashley testified that she did not want to live with her father because "it's almost like a cuss word but it's not  it's like we're where the devil is. With my gramma, it's like heaven and stuff, but with my father, I think you guys know what I'm searching for.... Because I don't really like to use the word and I don't ever use cuss words or anything...."
[5] We have on our own motion examined the entire superior court file in this case, and discovered that the children were placed with their father in October of 1997 and that jurisdiction was terminated in January of 1998. The dependency court had before it the family law order regarding this family, which had by then been modified to give Nicholas P. sole physical and legal custody, with the children's mother to have visits every other weekend and specified holidays, monitored by the maternal uncle or by appellant.