[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 596 
OPINION
Joel M. appeals following the jurisdictional and dispositional hearing in the dependency case of his son, Giovanni F. Joel contends the jurisdictional finding (Welf. Inst. Code, [1] § 300, subd. (a)) is unsupported by substantial evidence and the juvenile court abused its discretion by granting the maternal grandmother de facto parent status and by denying Joel's requests for a Marsden
hearing (People v. Marsden (1970) 2 Cal.3d 118
[84 Cal.Rptr. 156, 465 P.2d 44]) and a continuance. We affirm.
 BACKGROUND
In September 2009 the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition under section 300, subdivision (a) for Giovanni, who was not yet one year old. The petition alleged that Joel and Giovanni's mother, R.F., exposed Giovanni to the risk of serious physical harm and there was a substantial risk Giovanni would suffer serious physical harm inflicted nonaccidentally. On August 29, 2009, while Joel was driving and Giovanni and R.F. were passengers in the car, Joel punched R.F. several times in the face and choked her to the point of unconsciousness. R.F. sustained bruises on her forehead, both eyes and neck. Joel and R.F. had been involved in several verbal and physical confrontations over the past three years, some of which occurred in Giovanni's presence. Joel and R.F. had not complied with a safety plan they had signed in May.
Giovanni was detained in a foster home and then with maternal grandmother Mary E. Joel was arrested for attempted first degree murder (Pen. Code, §§ 664, 187, subd. (a)) and inflicting corporal injury on a cohabitant (Pen. Code, § 273.5). On September 3, 2009, he was released from custody with no charges filed. On October 23 the juvenile court entered a true finding on the dependency petition, granted Mary's de facto parent application and ordered Giovanni placed with relatives.
 DISCUSSION I The Jurisdictional Finding A
Section 300, subdivision (a) allows a dependency when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious *Page 598 
physical harm inflicted nonaccidentally upon the child by the child's parent. . . . [A] court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent . . . which indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) The child need not have been actually harmed in order for the court to assume jurisdiction. (See In re James R. (2009)176 Cal.App.4th 129, 135 [97 Cal.Rptr.3d 310].)
In the juvenile court, the Agency had the burden of proof by a preponderance of the evidence.[2] (In re Matthew S.
(1996) 41 Cal.App.4th 1311, 1318 [49 Cal.Rptr.2d 139]; § 355, subd. (a).) Joel now has the burden of showing the jurisdictional finding is unsupported by substantial evidence. (In re Diamond H. (2000) 82 Cal.App.4th 1127, 1135
[98 Cal.Rptr.2d 715], disapproved on another ground in Renee J.v. Superior Court (2001) 26 Cal.4th 735, 748, fn. 6 [110 Cal.Rptr.2d 828, 28 P.3d 876].) We view the record in the light most favorable to the juvenile court's order. (In reS.A. (2010) 182 Cal.App.4th 1128, 1140
[106 Cal.Rptr.3d 382].)
Joel acknowledges "[t]he evidence showed, in the light most favorable to the lower court's findings, that the specific allegations were proven." He further acknowledges that the evidence might have supported jurisdiction under section 300, subdivision (b), [3] a neglect provision. He contends, however, that there was no evidence supporting jurisdiction under section 300, subdivision (a), an abuse provision. Joel argues neither he nor R.F. abused Giovanni or harmed him nonaccidentally and Giovanni was not at substantial risk of suffering nonaccidental harm.
To the extent Joel argues that section 300, subdivision (a) cannot, by its terms, support jurisdiction when a child is exposed to domestic violence, he raises a question of law. We review that question de novo. (In re R.D. (2008)163 Cal.App.4th 679, 686 [77 Cal.Rptr.3d 793].) We conclude that the application of section 300, subdivision (a) is appropriate when, through *Page 599 
exposure to a parent's domestic violence, a child suffers, or is at substantial risk of suffering, serious physical harm inflicted nonaccidentally by the parent. Furthermore, in this case there was substantial evidence supporting the section 300, subdivision (a) jurisdictional finding.[4]
The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) Although many cases based on exposure to domestic violence are filed under section 300, subdivision (b) (e.g., In re Basilio T. (1992) 4 Cal.App.4th 155,168-169 [5 Cal.Rptr.2d 450], superseded by statute on another point as noted in In re Lucero L. (2000)22 Cal.4th 1227, 1239-1242 [96 Cal.Rptr.2d 56, 998 P.2d 1019]; In reHeather A. (1996) 52 Cal.App.4th 183, 193-194
[60 Cal.Rptr.2d 315]), section 300, subdivision (a) may also apply. It clearly applies to Joel's conduct in this case. His horrendous violence, discussed below, amply supports the juvenile court's section 300, subdivision (a) jurisdictional finding.
 B
Joel has an extensive criminal history, including acts of violence against others. He was violent with R.F. throughout their two-and-one-half-year relationship. He hit, slapped and beat her. He blackened her eye, bloodied her nose and choked her. He left her bruised and scarred. He called her demeaning names. He threatened to kill her. Joel was violent with R.F. even while he was driving. On one such occasion, he hit her in the stomach, then left her stranded. Some of the violence took place in Giovanni's presence. R.F. did not report the abuse. She believed Joel's promises that he would change.
In May 2009 the Agency received a report that Joel had been physically violent with R.F. Joel and R.F. denied any violence, but paternal grandmother Linda M. said Joel had been violent with her. He had grabbed her hand, twisted it, shoved her and screamed at her while he was holding four-month-old Giovanni. Linda obtained a temporary restraining order (TRO) against Joel. Joel and R.F. signed a safety plan and agreed to live separately until Joel received anger management counseling. They did not follow the plan. They remained together and moved without telling the Agency. *Page 600 
In late July or early August 2009, Joel punched R.F. in the face and gave her a black eye. Mary saw a cut above R.F.'s eye and bruises on her arms and legs. R.F. told Mary she had tripped and fallen down the stairs.
On August 29, 2009, police received a report of a woman yelling for help from a car. By the time officers found the car, it was outside Linda's home. R.F. was inside the home. She had a large swollen bruise on her forehead, bruises on both eyes and redness and bruising on her neck. R.F. explained that while Joel was driving, he had punched her several times in the face with his right hand and strangled her with his right hand until she lost consciousness. Giovanni was in the backseat during the attack.
Once they reached Linda's home, Joel and R.F. physically struggled over Giovanni's car seat while Giovanni was in it. The car seat hit Linda's bedroom window and the window cracked. Joel was screaming and Giovanni was crying. Linda took Giovanni out of the car seat and tried to calm him.
Joel fled before the police arrived. When they arrested him later that day, the knuckles of his right hand were swollen. He complained of pain in that hand when the officers handcuffed him. He said R.F. had tried to take Giovanni out of his car seat while the car was moving and Joel had injured his right arm while trying to hold the car seat down. Joel claimed that R.F.'s injuries were self-inflicted. He repeated this claim on later occasions and steadfastly denied he was ever violent with R.F. When a social worker suggested that Joel might benefit from domestic violence classes, he responded, "Me, no way. [R.F.]'s the one that's crazy."
R.F. moved to a domestic violence shelter. She told the Agency the August 29, 2009, beating was not the worst Joel had inflicted on her.[5] On August 31 R.F. obtained a TRO against Joel.[6] It was served the same day. Joel sent R.F. several e-mails in violation of the TRO.
 C
Domestic violence is nonaccidental. When it occurs in a moving vehicle, the potential for injury inherent in the violence is dramatically increased by the likelihood of a collision that could prove fatal. By driving with one hand on the steering wheel, and using his other hand to hit and choke R.F., Joel placed Giovanni, a passenger, at substantial risk of suffering serious physical harm. Any harm Giovanni suffered would have resulted from *Page 601 
Joel's nonaccidental conduct. Joel's assertion that his behavior did not endanger Giovanni is incorrect. His assertion that he did not intend to hurt Giovanni is immaterial. Joel's violence in the car would have been sufficient, by itself, to support jurisdiction under section 300, subdivision (a).
Moreover, on at least two other occasions Joel placed Giovanni at substantial risk of suffering serious physical harm inflicted nonaccidentally. After the violence in the moving car, Joel and R.F. struggled over Giovanni's car seat while Giovanni was still in it. On an earlier occasion, while Joel was holding Giovanni, Joel physically attacked Linda. The risk to Giovanni from Joel's violence on these occasions was increased by his history of violent attacks on R.F. and others, some of which occurred in Giovanni's presence; the repeated and serious injuries Joel inflicted on R.F.; Joel's denial that he was violent; his refusal to comply with the safety plan; and his violation of the TRO. The requirements for jurisdiction under section 300, subdivision (a) were met.
 II De Facto Parent Status
Mary's request for de facto parent status was accompanied by a declaration and a statement under penalty of perjury regarding her relationship with Giovanni. The statement, declaration and other evidence[7] in the record show that Mary took care of Giovanni approximately three days a week since his birth in January 2009. He lived with her from June 9 through August 9 and she was responsible for his day-to-day care from his birth until August 28. Mary noticed that Giovanni "was disturbed, shaking, upset after spending time with either parent." After spending time with Mary, Giovanni "was calm, sleeping well, eating well, and generally happier." In September, at a team decision meeting, Mary said she wanted Giovanni placed with her. She said she did not allow Joel in her home, she had support from family and neighbors, and a relative was going to move in with her. On October 8 Giovanni was detained with Mary.
No party presented any evidence in opposition to Mary's de facto parent request. Joel's counsel argued Mary had not been Giovanni's day-to-day caretaker for a significant period and that R.F. and Joel were Giovanni's psychological parents. *Page 602 
The court found that Giovanni had lived with Mary "for a substantial period of time, for his first nine months," and she "had significant involvement with [his] day-to-day care" during that period. R.F. and Joel lived with Giovanni in Mary's home, "or [were] there frequently during [the] entire period of time." Mary had "particular knowledge of the stress and pressures that Giovanni experienced" due to the discord and violence between his parents. The court granted Mary's request.
"`De facto parent' means a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Cal. Rules of Court, rule 5.502(10).) "Whether a person falls within the definition of a `de facto parent' depends strongly on the particular individual seeking such status and the unique circumstances of the case." (Inre Patricia L. (1992) 9 Cal.App.4th 61, 66
[11 Cal.Rptr.2d 631].) "[F]actors relevant to the decision . . . include whether (1) the child is `psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to[-]day basis for a substantial period of time; (3) the adult possesses information about the child unique from the other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact with the adult. [Citations.]" (Id. at pp. 66-67, fns. omitted.) The party seeking de facto parent status has the burden of proof by a preponderance of the evidence. (In re Jacob E. (2004) 121 Cal.App.4th 909, 919
[18 Cal.Rptr.3d 15].) "Because a court can only benefit from having all relevant information, a court should liberally grant de facto parent status." (In re Patricia L., supra, at p. 67.) We review the juvenile court's ruling for abuse of discretion. (In re Merrick V. (2004)122 Cal.App.4th 235, 257 [19 Cal.Rptr.3d 490].)
From the outset of this case, Mary was protective of Giovanni and assertive, on his behalf, with R.F. and Joel. From the time of Giovanni's birth, Mary assumed responsibility for his day-to-day care for long periods. He responded positively to her care. Mary had personal knowledge of Giovanni's exposure to domestic violence, its affect on him, and the improvement in his well-being when he was removed from the violent environment. She attended every juvenile court hearing. A future proceeding might foreclose any contact between Giovanni and Mary. The court did not abuse its discretion by granting her de facto parent status. *Page 603 
 III Marsden and Continuance A
On September 24, 2009, the court set the jurisdictional and dispositional hearing for October 23 at 8:30 a.m. Joel was present and the court ordered him to return. On October 14 the court again ordered Joel to return for the October 23 hearing.
On October 23, 2009, Joel checked in at the court's business office, then disappeared. He was not in the courtroom at 8:30 a.m. The court trailed the hearing until 9:00 a.m. Joel did not appear. The court delayed the hearing nearly 20 minutes more. An exhaustive search ensued but Joel could not be found.
Joel's appointed attorney asked the court to trail the matter until the conclusion of another hearing she had to attend. Counsel stated, "I do know that [Joel] — well, [Joel] and I spoke yesterday, and he indicated that he wanted aMarsden motion. Essentially he wanted a new attorney appointed for him and wanted to request that today. Given his position, I would ask that the court give him time to resurface to be able to make that motion." R.F.'s counsel opposed the request. The court concluded Joel had "voluntarily absented himself from these proceedings." It found there was no good cause for a continuance, citing Giovanni's age and the presence of all parties aside from Joel. The court declined to trail the matter.
After the close of evidence in the jurisdictional phase of the hearing, Joel's counsel renewed her request for a continuance and stated "it was [Joel's] intent to testify today." The court repeated that Joel had voluntarily absented himself and denied the request.
At 9:25 a.m., during closing argument in the jurisdictional hearing, Joel entered the courtroom. His attorney asked for a brief recess to speak with him. The court granted the request. After the recess, the court asked Joel's counsel if she wished to make any motions. Counsel again requested a continuance. She stated, "[Joel] was actually apparently outside using a cell phone since he has bad reception. He was trying to speak to a new attorney in order to retain a new attorney. That attorney did say he would be interested in taking the case, but that he would need a continuance for today." Counsel for Giovanni and the Agency opposed the continuance request. The court denied the request, citing section 352 and noting the trial had commenced, there had *Page 604 
been ample time for Joel to hire an attorney and, given Giovanni's age, it would not be in his best interests to continue the hearing.
 B
The juvenile court does not have a duty to initiate aMarsden hearing sua sponte. (People v. Lara
(2001) 86 Cal.App.4th 139, 150 [103 Cal.Rptr.2d 201]; In reZ.N. (2009) 181 Cal.App.4th 282, 289 [104 Cal.Rptr.3d 247] ["Marsden principles . . . apply . . . to dependency proceedings"].) A duty arises "`only when the [party] asserts directly or by implication that his counsel's performance has been so inadequate as to deny him his constitutional right to effective counsel.'" (People v. Lara, supra, at p. 151, quoting People v. Molina (1977)74 Cal.App.3d 544, 549 [141 Cal.Rptr. 533].)
Joel concedes the court was not required to conduct aMarsden hearing before Joel entered the courtroom, when his attorney said Joel wanted a Marsden hearing. Joel is correct. There was no request for a Marsden
hearing. Counsel merely asked the court to trail the matter so that Joel could make a Marsden motion when he appeared.
Joel contends that when he finally appeared, the court should have given him an opportunity to explain why he wanted new appointed counsel. The court was not required to do so. After Joel entered the courtroom and conferred with counsel, she requested a continuance. The request was based on Joel's attempt to retain a new attorney, not on an assertion that his appointed counsel's performance was inadequate. (In reZ.N., supra, 181 Cal.App.4th at p. 293.) There was still no request for a Marsden hearing. Thus, there was no error.
 C
Joel contends that once he appeared in the courtroom, the court should have granted his attorney's request for a continuance so he could retain new counsel.
Continuances are discouraged in dependency cases. (In reElijah V. (2005) 127 Cal.App.4th 576, 585
[25 Cal.Rptr.3d 774].) "[N]o continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary. . . ." (§ 352, subd. (a).) Absent "exceptional circumstances," if a child is *Page 605 
detained the dispositional hearing must be completed within 60 days of the detention hearing. (§ 352, subd. (b).) We review the denial of a continuance for abuse of discretion. (In re Elijah V., supra, at p. 585.)
Joel made his request during closing argument in the jurisdictional phase of the hearing. That alone would have justified the denial of a continuance. (In re Z.N.,supra, 181 Cal.App.4th at p. 294.) The request occurred more than a month after the hearing was set, more than a month after Joel told the Agency he intended to retain an attorney, and just 10 days before the section 352, subdivision (b) deadline. Giovanni was entitled to a prompt resolution of his custody status. (In re Ninfa S. (1998)62 Cal.App.4th 808, 811 [73 Cal.Rptr.2d 209].) The court did not abuse its discretion by denying the continuance request.
 DISPOSITION
The judgment is affirmed.
McDonald, J., and Irion, J., concurred.
[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] The court here found the allegations of the petition true by clear and convincing evidence.
[3] Section 300, subdivision (b) allows a dependency when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or the willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b).)
[4] Section 300, subdivision (a) refers to "harm inflicted . . . by the child's parent." Thus, when the violent perpetrator is not a parent, section 300, subdivision (a) is inapplicable.
[5] The juvenile court expressly found R.F.'s statements to be more credible than Joel's. We must defer to the juvenile court on questions of credibility. (In re Sheila B.
(1993) 19 Cal.App.4th 187, 199 [23 Cal.Rptr.2d 482]; In reS.A., supra, 182 Cal.App.4th at p. 1140.)
[6] R.F. later obtained a three-year restraining order.
[7] Mary also filed a document purporting to be a second declaration. It was not executed under penalty of perjury (Code Civ. Proc., § 2015.5) or incorporated into her statement which was executed under penalty of perjury. The facts in the document on which the court relied did not differ materially from facts in Mary's statement, her first declaration and the other evidence. *Page 606