Filed 6/15/16  In re Collin E. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re COLLIN E., a Person Coming Under the Juvenile Court Law. | D069361 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3941) |
| v. | |
| H.S. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Honorable

Gary M. Bubis, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and

Appellant H.S.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and

Appellant James E.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Senior Deputy County Counsel, for Plaintiff and Respondent.

H.S. (Mother) and James E. (Father) appeal from a juvenile court order granting de facto parent status to the caregivers of their dependent child, Collin E., the paternal grandfather (Jim E.) and his fiancée (Stephanie P.). The parents argue there is no evidence of psychological bonding between Collin and the caregivers, they had not provided care for a substantial period of time, and they had no unique information to offer the court.[1] The parents also contend the caregivers may hinder reunification. The record does not support these assertions. We conclude the juvenile court did not abuse its discretion in granting de facto parent status and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

Collin was born in June 2014. The San Diego County Health and Human Services Agency (the Agency) opened his dependency case in July 2015, following an incident during which Mother was observed stumbling and slurring her speech in a convenience store and had left Collin in the car. The Agency filed a petition on Collin's behalf under Welfare and Institutions Code section 300, subdivision (b), based on the convenience store incident, the parents' history of drug use, and Mother's prior voluntary case due to drug use.

---

[1]     These arguments are set forth in Mother's briefs, which Father joins. We note the parents may lack standing to bring this appeal. (See *In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261.) However, given our conclusion that the grant of de facto status is proper (and because the Agency does not address standing), we need not reach the issue.

2

The detention report identified Jim as a potential relative placement and contained information regarding his care for Collin and support of him and the parents. Jim said he would "check on [Collin] or take care of him whenever the parents would let him." He planned a first birthday party for Collin at his home, found a daycare, and made sure the baby proofing he purchased was set up. Jim also cosigned a lease on the parents' apartment and assisted with bills and rent. The paternal grandmother, who was divorced from Jim, said he had been " 'wonderful' caring for Collin," provided care three to four times per week, and bought diapers and clothing. However, Father felt Jim and Stephanie were "trying to take [Collin] away from them."

The Agency's jurisdiction and disposition report contained additional input from Jim, as well as Stephanie, and further addressed placement. Jim had obtained a restraining order against Father. In his request for the order, Jim alleged Father said he would never let Jim testify in Collin's dependency proceeding, which Jim viewed as threatening. The order was granted on August 17, 2015, for one year. As for Stephanie, she indicated she was making a doctor's appointment for Collin and provided other information about his medical care.

With respect to placement, the report stated Collin was placed with Jim and Stephanie on July 23, 2015. Father initially said he did not want Collin in his father's home, before clarifying he did not mind. He explained Jim worked "odd hours as a professional card player" and Stephanie was not safe to take care of Collin. He stated she was on Adderall and shaky, claimed she was a former methamphetamine user (explaining his friend was given Adderall to end such usage) and cited an incident in which Collin

3

almost fell off a table when she was changing him. Father said if Jim "would do majority of the caring for Collin then it would be alright" and he knew Stephanie loved Collin. Mother did not have concerns about Jim, but also did not want Stephanie to care for Collin. She said Stephanie took Collin to a baseball game when he was ill and also cited the changing table incident.

The maternal grandmother felt Jim was "the healthiest environment for Collin right now" and the "best place for [him] to be." A paternal aunt, Lori S., stated Jim was "the closest to Collin," had been taking care of him weekly, and provided him with a "good safe environment." The report concluded Jim and Stephanie had "the closest relationship to [Collin] as Collin ha[d] spent several days a week in the grandfather's home prior to his removal from his parents." An addendum report reiterated Jim was the "relative [with] the closest relationship and bond with the minor."

On September 2, 2015, Jim and Stephanie applied for de facto parent status. In their application (which appears to be written from Jim's perspective), they stated they had responsibility for Collin's day-to-day care since August 1, 2014, and he had lived with them since July 23, 2015. In the section titled "Information the judge should know about my relationship with the child," Jim explained: "Collin has spent most weekends at my home since he was born and we were actively involved in his day to day care" and referenced an attached statement. We summarize the statement.

With respect to Collin's daily care prior to removal, Jim and Stephanie would pick Collin up from the parents' home to watch him on the weekends. They bought him flashcards, books, and walkers to help with development, and took him swimming and to

4

family gatherings. Jim stated his family "started to joke that we were the parents because they only saw Collin with us an[d] never with [the parents.]" They also took him to a baseball game, the beach, his first movie in a theatre, the park, the zoo, and Disneyland, and provided his first Christmas celebration. Regarding Collin's care after removal, Jim explained Collin was now in daycare and it was helping with his development. Jim noted Collin previously lacked a schedule, but now had one and slept at night. He also said Collin used to bite, pull hair, and be very aggressive, but these behaviors had diminished or stopped. Collin would still get upset, but they were teaching him new ways to express himself. Jim stated they "believe[d] if [Collin] was vocal he would think he was given two sets of parents, his Mama and Dada and his Papa and Stephy."

As for medical care, Jim and Stephanie helped place a brace that Collin was required to wear. Stephanie joined the parents at doctor appointments, was the one who realized he had eczema, and did research to assist with his rashes. She also took him to the emergency room when he contracted respiratory syncytial virus (RSV), after picking up Mother. After Collin was hospitalized with RSV, they all stayed with him and Collin went to Jim's house after discharge.

Jim and Stephanie also provided support for Collin and the parents. Jim confirmed he signed a lease for the parents and assisted with rent, and Stephanie helped clean their house. They also had receipts for thousands of dollars spent on Collin and, according to Jim, "provided most of [his] things minus the gifts, clothes, [and] baby shower gifts from other family members." The statement also included Jim's views on the parents, their living situation, and their issues with substance abuse.

5

Jim and Stephanie also provided a letter from paternal aunt Kristin R. She stated they were "huge participant[s] in Collin's life from the start" and she would "refer to this arrangement as co-parenting." She confirmed they brought him to family events and said "in addition[] to having Collin overnight several times a week," they did "almost daily visits . . . ." She and her sister "joked about how it appeared as though [they] were the parents because they had Collin all the time." She felt "[w]hen all four of them were in the room it appeared as if Collin preferred to be with my dad and Stephanie . . . ." She also expressed concerns about Mother, including that she did not "believe a word out of [her] mouth" and she "always seem[ed] out of it and [she] [did not] know if it's from a disability or drug use."

At the contested adjudication and disposition hearing in October 2015, the court took jurisdiction, removed Collin from his parents' custody, and ordered reunification services. Jim and Stephanie were in attendance.

Later in October, Jim wrote to the parents to provide an update on Collin and asked them to provide pictures. Jim also contacted the paternal grandmother, after she expressed to the social worker that she wanted to encourage Collin's relationship with Father. Jim proposed she and Father choose one morning and evening each week to care for Collin, as well as a few doctor appointments, explaining the "end goal is getting [Father] ready to be a father." [2]

---

[2] These letters were submitted to the court with the caregivers' December 1 submissions, discussed *post*.

In a subsequent addendum report, the Agency stated Collin's placement remained appropriate, Jim and Stephanie were providing a suitable home and sufficient visitation, and, while Collin had only been with them four months, they "continue[d] to provide good and adequate care." It also noted the caregivers gave the parents a list of doctor's appointments, so they would have access to them. The report found the caregivers supported reunification, but were willing to provide a permanent plan if the parents did not reunify. It did note "some drama with the . . . family," as Father was concerned about not receiving enough visits, but indicated the restraining order was amended to permit positive contact, the paternal grandmother was providing supervised visitation, and the Agency was helping to mitigate visitation issues.

In November 2015, the juvenile court held a special hearing to address de facto parent status and other matters, which Jim attended. Although the case was before Judge Bubis, Referee Martindill oversaw the hearing. Jim preferred Judge Bubis hear the request, explaining the judge had "seen [the parents'] antics" and he "didn't want to have to recreate the wheel," but said he could move forward if needed. Referee Martindill continued the matter. Jim asked if he would be able to obtain the parents' testimony and the referee explained the hearing would consist only of argument. During discussion of a different issue, Father's counsel noted he "receives two visits per week[,] . . . has requested more visits and has been denied by the caretaker." County counsel stated the "time, location, [and] manner of the parents' visitation is under the decision and discretion of the Agency."

On December 1, Jim and Stephanie submitted additional materials in support of their request, including another statement. Jim again described the care they had provided for Collin and expressed frustration that, among other things, they did not know about the appeal or that the parents had signed the case plan. Jim learned about de facto status from a court clerk, who "made it very clear that it does not give me any parental rights but allows me to be present at all jurisdictional hearings and to be informed." Jim stated he told Father's attorney their purpose in seeking de facto status was "to be informed and involved in jurisdictional proceedings to protect Collin." He felt the attorney then lied in court, by indicating his "intentions [were] adoption" and that Father could not have contact with them because of the restraining order. Jim explained he "100 [percent] support[s] reunification as long [as] they get off drugs and do the case plan . . . ." Their statement again included comments about the parents and their behaviors.

They also provided copies of the October letters to the paternal grandmother and the parents, discussed *ante*, as well as other letters in support of their request. One was from a university study, reflecting Jim brought Collin for testing due to concerns about his development. Another was from Collin's day care; it noted Jim was "very in tune with Collin['s] needs" and Collin was always happy at drop off. Lori S. provided a letter as well, stating Jim and Stephanie had been "extremely involved with Collin since the day he was born . . . ." She also opined that Father and Mother were incompetent and drug addicts. Finally, they provided a legal memorandum, a list of doctor's appointments, records of items purchased for Collin, the lease Jim signed, and several "Acknowledgment of Extra Visitation" forms.

8

The continued hearing on de facto parent status was in December 2015, and Jim and Stephanie attended. Counsel for the parents stated they were "adamantly opposed" to de facto parent status. They argued the application had no information to show a psychological bond with Collin, the caregivers had provided cared for only four months and de facto status was premature, and there was no evidence they were the only ones with valuable information about him. Father's counsel further noted that although Jim said he supported reunification, the caregivers submitted letters criticizing the parents. She also objected to his claim that she lied in court, explaining she represents Father and presents his view of the case.

Minor's counsel argued in favor of de facto parent status, explaining the caregivers "were very involved in [Collin's] life since birth. It's been a considerable amount of time." She believed that based on Collin's young age, and given the caregivers' exclusive care for over four months and prior relationship, "in [his] eyes they are like a psychological parent." She argued this placed "them in a unique position to provide information to the court . . . ." County counsel also supported de facto status.

The juvenile court granted the de facto parent application. The court explained: "There is no magic amount of time. Clearly, the child has been in their care. They have access to information they can provide for the court." The court noted the letters provided by the caregivers reflected disappointment in the parents' behaviors, and reminded them, "it's not up to whether or not you like them or . . . their behavior or not." Acknowledging there was "some high tension here," the court emphasized the case was

9

in reunification and cautioned the caregivers against interference and to understand their role.

DISCUSSION

I.     *Law governing de facto parent status*

A de facto parent is a " 'person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period.' (Cal. Rules of Court, rule 5.502(10).)" (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 602 (*Giovanni F.*).)

The decision to grant or deny de facto parent status depends on the "particular individual seeking such status and the unique circumstances of the case." (*In re Patricia L.* (1992) 9 Cal.App.4th 61, 66 (*Patricia L.*).) In determining whether a person is a de facto parent, the court considers factors such as "whether (1) the child is 'psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to day basis for a substantial period of time; (3) the adult possesses information about the child unique from the other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact with the adult." (*Id*. at pp. 66–67.) The doctrine of de facto parenthood should be "liberally applied to ensure that all legitimate views, evidence, and interests are considered in dispositional proceedings involving a dependent minor." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.)

10

A person seeking de facto parent status has the burden of showing, by a preponderance of the evidence, that he or she qualifies to be a child's de facto parent. (*In re Jacob E.* (2004) 121 Cal.App.4th 909, 919.) We review the juvenile court's determination for abuse of discretion. (*Giovanni F.*, *supra*, 184 Cal.App.4th at p. 602; see *In re Michael R.* (1998) 67 Cal.App.4th 150, 156.)

II. *Analysis*

The court's order granting de facto parent status was proper.

First, there is ample evidence that Collin was psychologically bonded to the caregivers, and we therefore reject the parents' argument that such evidence is lacking. Multiple relatives commented on the caregivers' significant involvement in Collin's life, and one aunt even viewed the situation as "co-parenting." The same aunt suggested that when both the caregivers and parents were present, it appeared Collin preferred the caregivers. (See *Giovanni F.*, *supra*, 184 Cal.App.4th at p. 602 [observing minor "responded positively to [grandmother's] care"].) The Agency also found a close and bonded relationship. Jim himself felt that Collin would think he had two sets of parents. We note the parents contest the reliability of Jim's view, and also maintain the issue is whether Collin felt bonded to Jim, not the reverse. These concerns are misplaced. It was for the juvenile court, not us, to weigh Jim's credibility (*In re L.S., Jr.* (2014) 230 Cal.App.4th 1183, 1195 (*L.S.*)), and there was also evidence from other witnesses that Collin was bonded to the caregivers.

Second, the caregivers functioned in the requisite parental role for a substantial period of time. In addition to the four months during which Collin was placed with them,

11

they had taken on parental responsibilities for much of his life, including providing care multiple days a week, assisting with medical care, and handling much of his material support. (See *Christina K. v. Superior Court* (1986) 184 Cal.App.3d 1463 (*Christina K.*) ["Time, in and of itself, does not determine whether foster parents are de facto parents."].) The parents disagree, claiming the caregivers did not provide day-to-day care until Collin was placed with them, suggesting four months of care was insufficient, and citing cases where minors resided with caregivers for "considerable periods of time."[3] These cases do not support their position. *In re Ashley P.* (1998) 62 Cal.App.4th 23 (*Ashley P.*) and *In re Vincent C.* (1997) 53 Cal.App.4th 1347 (*Vincent C.*) did involve longer periods of care prior to the de facto parent status determination, but did not hold that a particular amount of time is necessary. (See *Ashley P.*, at p. 25; *Vincent C.*, at p. 1358.) *Patricia L.* also involved a long period of care, but did not appear to specify how much time had passed when de facto status was granted. (See *Patricia L.*, *supra*, 9 Cal.App.4th at p. 65.)

We focus briefly on the last decision they cite, *Giovanni F.*, in which this court affirmed de facto parent status for a grandmother. (*Giovanni F.*, *supra*, 184 Cal.App.4th at pp. 601-602.) We observed the evidence showed she cared for the minor "approximately three days a week since his birth in January 2009," he "lived with her

---

[3] The parents actually state the caregivers did not assume daily care until August 1, 2015. This both postdates the July 23, 2015 placement and appears to be a misreading of the de facto application, where the caregivers indicate they assumed such care on August 1, *2014*. The parents elsewhere correctly identify the August 1, 2014 date, but still misinterpret it to mean August 1, 2015 (describing the period between that date and the September 2, 2015 application as "a little over one month.").

from June 9 through August 9," and she "was responsible for his day-to-day care from his birth until August 28." (*Id.* at p. 601.) But we also noted the juvenile court found he lived with her " 'for his first nine months . . . .' " (*Id.* at p. 602.) Without focusing on the period of residence, we concluded that "[f]rom the time of [the minor's] birth, [she] assumed responsibility for his day-to-day care for long periods." (*Id.*) Similarly, we need not fixate on how long Collin was placed with the caregivers, as they provided regular care throughout his life. The parents claim *Giovanni F.* is distinguishable, because the minor lived with the grandmother for a longer period and she submitted input under penalty of perjury. However, as our discussion *ante* reflects, it is unclear how long the minor actually resided with the grandmother and, regardless, the case did not focus on that issue. The parents also provide no authority that sworn evidence is necessary for a de facto parent application and, again, credibility was an issue for the juvenile court. (*L.S.*, *supra*, 230 Cal.App.4th at p. 1195.)[4]

Third, the caregivers possessed information about Collin that was unique from other participants. As his sole caregivers for four months, they had special insight into his needs, behavior, and development during that period. (*Ashley P.*, *supra*, 62

---

[4] In an effort to distinguish *Christina K.*'s statement that time is not determinative, the parents also suggest the de facto request was too late to be useful. We disagree. They contend *Christina K.* concerned disposition, when information about the minor was critical, while the request here occurred later and the court did not need such evidence. In fact, the case involved a status review hearing, addressed the opposite issue—whether a certain period of time had to pass for de facto status, and concluded it did not. (See *Christina K.*, *supra*, 184 Cal.App.3d at pp. 1466, 1468-1469; see also Cal. Rules of Court, rule 5.534, subd. (e) [de facto standing may apply at "the dispositional hearing and any hearing thereafter at which the status of the dependent child is at issue."].)

Cal.App.4th at p. 27 ["As their caretaker, [the grandmother] had special information about the children."]; *Giovanni F.*, *supra*, 184 Cal.App.4th at p. 602 [grandmother had "personal knowledge of . . . the improvement in [the minor's] well-being . . . ."].) Given their significant role in his life prior to that time, they had other information to offer as well. (See *Vincent*, *supra*, 53 Cal.App.4th at p. 1357 ["[I]t is because of [the grandmother's] extended involvement and familiarity with the children that her input regarding their future care is so important to the children, not just to [her]."]; *In re B.G.* (1974) 11 Cal.3d 679, 693 [noting generally that "the views of such persons who have experienced close day-to-day contact with the child deserve consideration."].)

The parents identify several reasons the caregivers purportedly lacked unique knowledge. None are persuasive. They cite the medical information in the application and argue any foster parent could acquire it. The fact that a different caretaker could provide information about the minor just underscores that caregivers *do* have information to offer—and here, Jim and Stephanie are in that role. The parents also suggest the Agency already had information about Collin or could obtain it. But that information originated, in part, from the caregivers, and actually supports their position that they have knowledge about Collin. Finally, the parents contend this case is "no different" than other dependency cases. The caregivers simply need to show they have information "unique from the other participants" in *this* case (*Patricia L.*, *supra*, 9 Cal.App.4th at

14

p. 67), and they have made that showing.[5]

Fourth, the parents acknowledge the caregivers were involved in court proceedings. They began attending hearings in October 2015, and their December 1 statement suggests they felt "shut out" prior to that time. Further, the extensive materials they provided to support their de facto parent application reflect their commitment to participating in Collin's case.

Fifth, a future proceeding could permanently foreclose contact between Collin and the caregivers. Given the family tension here, if the parents reunify with Collin, they may limit this relationship themselves. (*See In re Bryan D.* (2011) 199 Cal.App.4th 127, 142 [noting the "risk that future proceedings could . . . permanently foreclose future contact between grandmother and [the minor], particularly in light of the acrimony between mother and grandmother."].) If the parents do not reunify, they concede Collin could be placed elsewhere and the caregivers could risk not seeing him again. However, they contend the case was in the early reunification stage. But the question is whether contact could be foreclosed *in the future* and it plainly could, whether the parents reunify or not.

Finally, we address the parents' arguments that de facto parent status could impede reunification. Their concerns are unfounded. They first suggest de facto status will encourage the caregivers to overstep their role. However, the caregivers' December 1

---

5    The parents also argue the information the caregivers had to offer "concerned the parents, not Collin." The record does not support this contention.

statement reflects they understand the purpose of de facto status and the juvenile court has reminded them about their role in the process.

Next, the parents claim the caregivers were antagonistic toward them, citing the refusal of Father's request for more visits, the restraining order, and critical comments about the parents (and Father's counsel) in the de facto application and at the November 2015 hearing. The parents provide few details about the purported refusal of visits, while the record reflects the caregivers made Collin available for extra visits and encouraged visitation and participation in doctor's appointments.[6] With respect to the restraining order, we decline to speculate about Jim's motives in obtaining it and observe the order itself did not hamper reunification; it was modified to permit positive contact and visits actually did occur. As for the critical comments about the parents and Father's counsel, we agree they were inappropriate, but they did not establish the caregivers would interfere with reunification.

Lastly, the parents direct us to *Ashley P.* There, the juvenile court denied a grandmother's request for de facto parent status because she purportedly thwarted reunification, among other reasons, and the court of appeal reversed. (*Ashley P.*, *supra*, 62 Cal.App.4th at p. 28.) The parents claim *Ashley P.* is distinguishable, contending the court reasoned reunification was not a case goal and the grandmother provided care for two years. Although the court did note reunification was not at issue, it expressly stated

---

6      We note County counsel stated at the November 2015 hearing that the Agency determines visitation. However, based on the Agency report referencing the adequate visitation provided by the caregivers and the "[e]xtra [v]isitation" forms in the record, we assume the caregivers had at least some control over it.

16

the grandmother "violated no court order, and did nothing to frustrate any goal announced by the court."  (*Id.*)  The court's reunification discussion also made no mention of the period of care.  (See *id.*)  If anything, *Ashley P.* supports de facto status, as the caregivers here have done nothing to frustrate the juvenile court's goals.

We conclude the juvenile court properly granted the caregivers de facto parent status.

DISPOSITION

The order is affirmed.


O'ROURKE, J.

WE CONCUR:


NARES, Acting P. J.


IRION, J.