Filed 3/4/15  In re G.V. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re G.V., A Person Coming Under the Juvenile Court Law. | B258385 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK04668) |
| Plaintiff and Respondent, | |
| v. | |
| DAVID V., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Timothy R. Saito, Judge.  Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Appellant.

Office of County Counsel, Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel for Respondent.

_____

David V. (father) appeals from the order adjudicating his daughter, G.V., a person described by Welfare and Institutions Code section 300, subdivision (b), and from the dispositional order placing G.V. with her mother, S.A. (mother). Father contends the orders were not supported by substantial evidence. Father also challenges the dependency court's alleged failure to comply with the notice provisions of the Indian Child Welfare Act (ICWA). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The family first came to the attention of the Department of Children and Family Services (DCFS) in March 2014, when father called the abuse hotline with a false report that mother was abusing G.V. The DCFS's investigation would ultimately determine that father, not mother, was presenting a danger to the child.

G.V. was born in November 2013. At that time, mother and father were living together in the home of maternal grandparents. Mother and father argued frequently. Although it does not appear that father ever struck mother, he often threw objects in anger, and pushed mother at least once. At one point, he raised his hand to strike maternal grandmother, but mother intervened. In January 2014, mother began seeing a therapist.

Things came to a head in February 2014. On February 9, 2014, mother saw that father had posted an advertisement on the internet seeking transsexual sex and "partying" with methamphetamine. When mother confronted father with the advertisement, the two had a huge argument. On February 10, father attempted to apologize, but mother wanted him to leave. Father's temper flared and he began to yell at mother. Father threw a toolbox. Additionally, father picked up a beer bottle and looked as though he might smash it against a wall. At some point, maternal grandfather interceded and yelled at father to leave. While father and maternal grandfather argued, mother called police. Father then began throwing his body against the wall, saying, "Help me." Maternal grandmother told mother to bring G.V. to her; the infant was shaking, afraid of all the yelling.

2

When the police arrived, both mother and father reported that the argument had been only verbal, not physical. Mother, however, had feared that the argument would escalate. The police concluded that no crime had been committed. Although the police attempted to convince father to leave the house voluntarily, he refused. Mother took G.V. and went to stay overnight with maternal uncle.

For a few days, father was contrite. He moved out of maternal grandparents' home, so that mother could return. He sent mother text messages apologizing for his actions. He said he was "crushed, lost, and miserable." He called himself "a monster that just ruins everything" he touches. He stated, "Everyone hates me but nobody hates me as much as I do." He repeatedly indicated that he was battling depression and expressed an intent to kill himself, either with a gun or pills. When mother told him to "[t]hink about [G.V.]," father responded, "I am thinking of her. I need to protect her from me ruining her life too." On February 12, mother, accompanied by maternal uncle, took G.V. to a McDonald's to visit father. Father was calm.

On February 15, 2014, father texted mother that he had spoken to a doctor who specializes in anger management and bipolar disorder. Talking to the doctor "felt amazing." Father started to come to the conclusion that he had been "abusing" mother, by "threatening" and "[h]umiliating" her. He told her that what he had done "was worse than hitting." He wrote, "How can [you] believe me now when I've promised you in the past? Now I understand why [you] feel the way [you] do and what I need to do to show [you] my sincerity. I don't want to be that monster anymore."

Father's change of heart was short-lived. On February 17, 2014, mother went to see father because she wanted to give him another chance. She offered to help father go to a hotel, and father became "crazy" again. He threw a cell phone at mother while she was holding G.V.

At some point in early March 2014, mother obtained from the family court a temporary restraining order against father. On March 12, 2014, the family court dissolved the restraining order, concluding mother had not met her burden of proof.

Less than one week later, father called the abuse hotline, reporting that mother smoked marijuana in the presence of the baby. Father also reported that mother's best friend (whom he refused to otherwise identify) told him that, on March 17, 2014, mother had yelled at G.V. and hit the child on the thigh, leaving a red mark. Both the police and DCFS went to maternal grandparents' home to investigate father's allegations of abuse. There was no evidence of the abuse; the allegations were unfounded.[1] However, DCFS became concerned regarding father's previous abusive and violent conduct toward mother, and his possible drug use.

On March 25, 2014, the DCFS social worker requested mother and father to drug test the following day. Mother tested negative; Father did not appear for the test. On April 7, 2014, the social worker left a detailed phone message for father to test on April 8. Father again did not test. That day, the social worker accompanied mother to a restaurant for father's visit with G.V. Mother showed the social worker a photograph of father from three months before, to show how much father's appearance had changed. When father arrived, he acted jittery. Father was very pale and his face looked bony. When asked, father said he had not received the message about the drug test. The social worker rescheduled father's test for the following day and told him he must go; father missed this test as well. Shortly thereafter, mother asked father, by text message, why he did not take the drug test if he was not, in fact, using methamphetamine. Father told her that, although he believed the drug test was unconstitutional, the only reason he had not tested was because he was afraid of a false positive due to his use of medical marijuana.

A mediation had been scheduled in the family court matter for April 16, 2014.[2] The mediation did not occur, however, because when father arrived, the mediator

---

[1] At a later date, father texted mother and apologized for reporting her for child abuse, saying, "It was the worst thing I could have done to you. I don't believe in my heart you would hurt [G.V.] and you'll never hear me say it again."

[2] When father reported mother for child abuse, he told DCFS that he had filed for custody of G.V. in the family court matter. The record is not clear as to whether he actually did file for G.V.'s custody.

4

believed he was under the influence of a controlled substance.  Father was sweating profusely and panting.

On April 17, 2014, the DCFS social worker obtained a warrant to remove G.V. from father, even though G.V. was in mother's custody.  On April 22, 2014, DCFS filed a petition alleging that G.V. was dependent under Welfare and Institutions Code section 300, subdivisions (a) [father's abusive conduct placed G.V. at risk of physical harm] and (b) [G.V. was at risk due to both parents' substance abuse, father's altercations with mother, and father's mental and emotional problems].  That day, a detention hearing was held.  G.V. was ordered detained from father and released to mother.  Father was given monitored visitation.  Both parents were to be given referrals for counseling.

On April 29, 2014, a Family Team Decision Making session was held, with mother, father, maternal uncle, a social worker, and a substance abuse navigator.  A Safety Plan was developed whereby father would have monitored visits twice weekly and submit to on-demand drug testing.  Father refused to sign the Safety Plan.

On April 30, 2014, father missed another random drug test.  He had, however, taken a drug test for his employer on April 24; the test was negative.

On May 14, 2014, father's attorney notified him of upcoming court dates.  On the same form, the attorney indicated that father should immediately begin:  (1) individual counseling to address domestic violence and mental health issues; (2) parenting classes; and (3) random drug testing.  Father was to contact DCFS to obtain the referrals.  Although father signed the form, he wrote, across the information regarding counseling, parenting, and drug testing, "I DO NOT CONSENT."

On May 22, 2014, the DCFS dependency investigator monitored a visit for father.  She gave him a list of referrals.  Father told the investigator that the allegations were false and the detention was based on unreliable evidence.  He stated he would not drug test without a warrant.  The investigator explained that she would meet with father later to discuss the court process and the allegations; she did not want to take time away from the visit to further discuss them.  The investigator made an appointment with father to

5

discuss the allegations. Ultimately, father did not make himself available for the meeting, preferring instead to accuse DCFS of violating his rights.

On June 19, 2014, father sent the investigator a form entitled "Violation Warning – Denial of Rights Under Color of Law." He attached to the form a statement explaining that he believed DCFS was depriving him of his rights by attempting to require him to drug test without a warrant and attempting to separate him from G.V. based on lies told by mother and her family. He took the position that the family court order lifting the restraining order meant that he was "effectively proven innocent of all allegations and given legal access" to G.V. He attached a stack of documents which purported to demonstrate that the DCFS social worker was a "kidnapper and civil rights oppressor" due to her failure to "perform a proper investigation."

The adjudication hearing was set for July 14, 2014. By that time, mother had starting parenting classes. Mother also indicated that father had admitted, in a text message, that he had posted the internet advertisement referencing cross-dressing and methamphetamine.

The hearing was continued to August 5, 2014. In the interim, father had missed some visits with G.V. Mother had continued to drug test, and her results were negative.

The hearing occurred over three days. Mother testified only to authenticate the text messages from father. Father testified at length, denying all allegations against him. According to father, during the February 10, 2014 fight, maternal grandfather had hit father and threatened to kill him. Father testified that he did not throw a toolbox; he simply threw away a playing card box and missed the trashcan. He testified that he does not use methamphetamine and he never has. His appearance changed due to stress and Weight Watchers weight loss, not drug use. He declined to drug test because he stood by his constitutional right to demand a warrant or court order. He is not bipolar; he is not depressed.

Mother reached a negotiated disposition with DCFS. As to mother, the petition was amended to allege only that father had a history of physical and aggressive verbal altercations with mother, and mother was unable to protect G.V., in that she had allowed

6

father to live in the home. As amended, mother pleaded no contest. The court found the amended petition to be true as to mother. The hearing proceeded against father.

The court, relying heavily on the evidence in the DCFS's reports, found several of the allegations of the petition true against father. The court struck the allegation that G.V. was described by Welfare and Institutions Code section 300, subdivision (a). As to the allegations under subdivision (b) of that section, the court found true allegations that: (1) father has a history of substance abuse and is a periodic user of methamphetamine and marijuana, which render him incapable of providing regular care for G.V. and place her at risk; (2) father's history of verbal and physical altercations against mother in G.V.'s presence places G.V. at risk; and (3) father has mental and emotional problems, including anxiety and depression, which render him unable to care for G.V. and place her at risk.

The case proceeded to a hearing on disposition. The court found by clear and convincing evidence that there is a substantial danger to G.V.'s physical or emotional well being if she were returned to father's custody. The court ordered G.V. to be placed in mother's home. Father was granted monitored visitation. He was ordered to attend counseling, parenting class, and a psychiatric evaluation. He was also ordered to random and on-demand drug testing; if he failed to complete 10 clean tests, he must attend a drug rehabilitation program.

Father appeals. On appeal, he does not contend there was insufficient evidence that, *in February 2014*, he was physically and verbally aggressive with mother, and experienced mental and emotional problems. He argues, however, that the evidence is insufficient that, at the time of the hearing *in August 2014*, he constituted a present risk of harm to G.V. Similarly, he challenges the court's disposition order as unsupported by evidence that there were no reasonable means to protect G.V. if she were returned to his custody. Finally, he contends the court failed to comply with ICWA.

7

**DISCUSSION**

1.    *The Jurisdiction Order is Supported by Substantial Evidence*

Jurisdiction under Welfare and Institutions Code section 300, subdivision (b) may be supported by domestic violence. (See *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598-601.) Alternatively, it may be supported by the parent's inability "to provide regular care for the child because of the parent's mental illness . . . or substance abuse." [Citation.] [¶] [Jurisdiction requires proof of] " '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' [Citation.]" (*In re John M.* (2013) 217 Cal.App.4th 410, 418 (*John M.*). We are concerned here with the third element.

"Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) Among the relevant considerations in evaluating the risk of future harm is a parent's ' "current understanding of and attitude toward the past conduct that endangered a child . . . .' " (*John M., supra*, 217 Cal.App.4th at pp. 418-419.)

The juvenile court's finding that a child is a person described by Welfare and Institutions Code section 300 must be supported by a preponderance of the evidence. (Welf. & Inst. Code, § 355; *John M., supra*, 217 Cal.App.4th at pp. 410, 418.) On appeal, we review those findings for substantial evidence, which is relevant evidence that " 'adequately supports a conclusion; it is evidence which is reasonable in nature, credible and of a solid value.' [Citation.]" (*In re Francisco D.* (2014) 230 Cal.App.4th 73, 80.)

In this case, there is substantial evidence supporting the trial court's finding that father's violence toward mother, drug use, and emotional problems run a present risk of harm to G.V. This is so because father remained in denial about his problems, and obtained no help to remediate them. Father's text messages after the events of February 10 show that father *at that time* understood that his depression led to violent outbursts

8

which made him unsafe around his family. But after one productive visit with a doctor, father apparently stopped going. A few days after he saw the doctor, he was "crazy" again and threw a cell phone at mother while she held G.V. In March, he falsely accused mother of striking G.V. In March and April, he refused to drug test. In April, he attended a family court mediation – at which custody and visitation with G.V. were to be discussed – under the influence of a controlled substance. In April and May, he rejected referrals and recommendations for counseling and parenting classes. In May and June, he refused to meet with a DCFS investigator to discuss the allegations. In June, he accused the DCFS social worker of kidnapping his daughter based on false allegations made by mother. The events of February 2014 were not an isolated incident, after which father obtained the counseling he needed and drug tested clean. Instead, father denied that he needed help and rejected it at every turn. Father therefore constituted a present risk of harm to G.V.

2.      *The Disposition Order is Supported by Substantial Evidence*

After an adjudication of dependency, a "dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . . [¶] There is or would be a substantial danger to the health, safety, protection or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (Welf. & Inst. Code, § 361, subd. (c)(1).) We review the juvenile court's dispositional finding for substantial evidence. (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.) Father contends there is insufficient evidence supporting the court's disposition order removing G.V. from his custody, in that there was no evidence that he presented a danger to G.V. and the trial court did not consider any reasonable means to protect G.V. without removing her from his custody.

9

Preliminarily, Welfare and Institutions Code section 361, subdivision (c) does not apply to father, as he was not a parent "with whom the child resides at the time the petition was initiated." G.V. lived exclusively with mother from February 11, 2014 onward. The petition was initiated more than two months later, on April 22, 2014. There was no need for clear and convincing evidence of substantial danger prior to removing G.V. from father's custody because the law on which father relies applies only to custodial parents. (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 970 [Welfare and Institutions Code section 361, subdivision (c) does not apply to a parent who did not have custody at any point relevant to the proceedings].)

In any event, even if the statute applied, the evidence was sufficient to support the court's findings. We have already discussed the substantial evidence that father presented a danger to G.V. The same evidence supports the finding that no reasonable means existed to protect G.V. without removing her from father's custody.[3] Father was offered the opportunity to drug test; he refused. He was offered referrals for individual counseling and parenting; he chose not to go. A mediation regarding custody was scheduled in the family court matter; he attended under the influence of a controlled substance. A facilitator negotiated a Safety Plan; he refused to agree to it. Father was offered repeated opportunities to avoid removal; he rejected every one.

3.      *There was no Necessity for ICWA Notice*

Finally, father argues the trial court failed to properly comply with the notice requirements under ICWA. "By its own terms, [ICWA] requires notice only when child

---

**3**      Father also argues that the DCFS report for the adjudication/disposition hearing did not sufficiently address DCFS's reasonable efforts to prevent removal of G.V. from father. (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809.) We disagree. The report included a section entitled "Reasonable Efforts," which set forth DCFS's: (1) unsuccessful efforts for father to drug test; (2) attempts to provide father with referrals he failed to use; and (3) attempts to arrange a meeting with father to discuss the allegations, which were rebuffed as father preferred to accuse DCFS of violating his civil rights.

10

welfare authorities seek permanent foster care or termination of parental rights; it does not require notice *anytime* a child of possible or actual Native American descent is involved in a dependency proceeding." (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 14.) In this case, DCFS never attempted to remove G.V. from her home, and the court never ordered such removal. As such, notice under ICWA was not required. (*Id*. at p. 15.)

## DISPOSITION

The jurisdiction and dispositional orders are affirmed.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

11