Filed 6/8/23  In re L.L. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re L.L., a Person Coming Under the Juvenile Court Law. | D081442 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>P.L.,<br><br>    Defendant and Appellant. | (San Diego County Super. Ct. No. NJ14135B) |

APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

# I.

# INTRODUCTION

P.L. (Father) appeals a juvenile court order terminating parental rights to his son, L.L.  Father contends that the juvenile court erred in denying his request for a continuance of the contested Welfare and Institutions Code[1] section 366.26 hearing in order to obtain a bonding study between Father and L.L.  Father also asserts that the Agency and court failed to satisfy their duties of initial inquiry under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq. (ICWA)).  Specifically, Father claims that the Agency and court failed to inquire of the child's mother (Mother), who has not appealed, and unnamed maternal relatives as to whether L.L. may be an Indian child for purposes of ICWA.

We reject the majority of Father's contentions.  The Agency concedes error with respect to the Agency's and court's inquiry of Mother, however.  Nevertheless, we conclude that on this unique record the error was not prejudicial.  We therefore affirm the challenged order.

# II.

# FACTUAL AND PROCEDURAL BACKGROUND

A.  *General background*

Father has lost or relinquished custody of four children who are older than L.L.[2]  He participated in a voluntary services case in 2002, as well as three prior dependency cases in 2002 and 2009.

---

[1]  Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]  Mother has lost or relinquished custody of all seven of her other older children.

2

In 2019, Father was granted legal and physical custody of L.L. by order of the family court, with Mother having supervised visitation once a month.

Since L.L.'s birth in 2011, he has been the subject of 15 child welfare hotline referrals; these referrals involved reports that L.L. was malnourished, physically struck or pushed by Father, handcuffed and verbally abused by Father's girlfriend, and injured by another child in the home.

L.L. was diagnosed with autism spectrum disorder and moderate intellectual disability. During the pendency of this case, L.L. was also diagnosed with adjustment disorder with mixed anxiety and depressive symptoms as a result of significant fear-based anxiety.

B. *The detention and reunification period*

Father started participating in a voluntary services case with respect to L.L. beginning in April 2020. However, in July 2020, the Agency filed a section 300, subdivision (a) dependency petition for then nine-year-old L.L., alleging that L.L. had suffered and/or was at substantial risk for suffering serious physical harm. The Agency cited, among other things, the excessive discipline, nutritional neglect, and risk of starvation that L.L. had experienced while in Father's care; the parents' history of domestic violence and failure to reunify with L.L.'s older sibling, A.L.; and Father's failed attempt at voluntary services. The Agency further noted that L.L. had been placed in his paternal grandmother's care in May 2020, and he was "rapidly gain[ing] weight" and "expressed fear of returning to [Father]."

When interviewed by a social worker, Father denied having any Native American Indian heritage. At the time the petition was filed, the Agency could not locate Mother. However, the Agency noted with respect to Mother that in connection with a 2008 jurisdictional report regarding another child, Mother "reported that she does not have any known Native American

3

Heritage," and further noted that "[p]er prior court findings, the mother does not have Native American history."

The trial court detained L.L. in late July 2020, ordered that L.L. be placed in his paternal grandmother's home, and ordered reunification services for Father, alone, given that Mother's whereabouts were unknown.

In late September 2020, the Agency located Mother and requested a special hearing so that the court could appoint counsel for Mother. Mother indicated that she had last visited with L.L. in person in November 2019, but after that point in time, Father stopped communicating with her. The court ordered reunification services for Mother.

Father completed a parenting education program in November 2020. However, Father reported that he did not believe he had a need to attend a child abuse group. Father repeatedly denied responsibility for the dependency case and instead blamed others.

During the reunification period, Father engaged in visitation with L.L. However, during the period between August 2020 and November 2020, Father cancelled at least seven visits, only two of which he made up at a later date. Father also cancelled some visits in March and April 2021. As of July 2021, L.L.'s caregiver reported to L.L.'s court-appointed special advocate (CASA) that L.L. often returned from visits with Father in a negative, anxious mood. L.L.'s parents and his caregiver (L.L.'s paternal grandmother) independently reported that L.L. displayed increased fear, anxiety and sadness during visits with his parents than he displayed in his "typical emotional state."

The trial court terminated Father's reunification services at a contested 12-month status review hearing that took place on January 25, 2022.

Mother stopped participating in in-person visitation with L.L. in August 2021.  Mother's services were ultimately terminated in June 2022.

C.   *The postreunification period*

By August 2022, Father had begun shortening his weekly visits with L.L. and was spending approximately an hour with L.L.  As of mid-August 2022, L.L. began refusing visits with Father.  In mid-September 2022, L.L. informed the Family Visitation Center that he no longer wanted to visit with his father; the Family Visitation Center closed Father's visitation referral at that point.  L.L. continued to refuse visits with Father up until and through the section 366.26 proceedings.

D.   *The permanency planning period*

The section 366.26 hearing was initially set to take place in October 2022.  Both parents were present by telephone for the hearing.  However, the Agency requested a two-week continuance in order to prepare and file its section 366.26 report.  The court granted the continuance and ordered the parents to appear in person or by telephone on the continued hearing date.

Before the hearing concluded, however, counsel for Father asked the court to "reiterate the current visitation order."  Counsel was referencing the fact that there had been no visitation between L.L. and Father for a period of time.  Counsel indicated that Father had been told that there had been a contractual issue between the visitation center and the Agency, which led to visits being cancelled, which then led to L.L. being resistant to visits.  At this point, however, counsel for L.L. spoke and indicated that L.L. had communicated to minor's counsel that he "did not want to have any visits with his parents at this point."  Counsel noted that he did not "want [L.L.] to be forced to have visits if he doesn't want to."  The court acknowledged that L.L. "cannot be forced to go to the visit," but encouraged the use of

5

"alternatives," such as "phone contact or virtual contact" and indicated that the parties would "sort through the particulars at the next hearing."

The Agency then filed its section 366.26 report, in which it recommended termination of parental rights and a permanent plan of adoption for L.L. The social worker indicated that L.L.'s caregiver, his paternal grandmother, was interested in adopting L.L., and also reported that L.L. had indicated his desire to be adopted by his caregiver.

The continued section 366.26 hearing resumed on November 21, 2022. On the record, the juvenile court noted that there had been a "brief chamber's conference." The court noted that Father and Mother had requested a contested section 366.26 hearing, and the court then asked the parties and their attorneys whether that "fairly state[d] the chambers conference." The attorneys answered in the affirmative without further comment. The court set the contested hearing to take place in early January 2023.

The juvenile court held the contested section 366.26 hearing on January 6, 2023. Father was present, and Mother appeared telephonically.

At the beginning of the hearing, the court indicated that the parties and counsel had just participated in a lengthy chambers conference, and the court wanted to permit Father's counsel to make a record regarding her request for a continuance. Father's counsel stated that she was requesting a continuance of "at least 60 days," given that Father "has had difficulty seeing his child for his court-ordered visits since August." Father's counsel indicated that she was asking for the 60-day continuance to give Father a chance to establish the consistent visitation prong of the beneficial parent-child relationship exception, and to allow Father to obtain a bonding study. Counsel stated that she had informed the court "at the original .26 hearing

6

where [she] set th[e matter] for trial" that she "wished to use a bonding expert for trial."

As part of her argument in favor of the continuance, counsel contended that the social worker had failed to communicate with Father about whether L.L. would be produced for visits again, after the issue with the visitation center occurred. Counsel raised the idea that Father had a "hostile" relationship with L.L.'s paternal grandmother, paternal step-grandfather, and paternal aunt, and argued, without citing evidence, that Father's position was that "the child has been coached and worked on and alienated from his father in the time that he has not seen him." Counsel stated that her investigator had been on a telephone call with the social worker and L.L., and when the social worker asked L.L. if he'd like to visit his father, L.L. responded in the affirmative. Counsel conceded, however, that L.L. "sometimes gives different answers depending on who[m] he is talking to." Counsel argued that a bonding study would provide "the most fair assessment of the attachment [L.L.] may or may not have with his father."

Minor's counsel and county counsel both disputed Father's counsel's characterization of L.L.'s wishes. Both attorneys represented that L.L. was very clear and adamant about not wanting to have visits with Father. Minor's counsel stated a concern about the "trauma he goes through" regarding visitation, and stated that "as his guardian ad litem, I can't in good conscience keep putting him through that."

The juvenile court determined that it would not be in L.L.'s best interest to continue the matter for the completion of a bonding study and denied Father's request for a continuance, but indicated an openness to revisiting the question should the evidence presented at trial warrant it. In reaching its conclusion, the court expressly disagreed with Father's position

that the social worker was to blame for the lack of visits between L.L. and Father, and the court found instead that the social worker had "utilized a very sensitive approach to empowering [L.L.] to make his own decision." The court further found that L.L. had been "remarkably consistent, not only in his verbal responses, but in his emotional and physical responses to a request to visit with his father," and these requests had "all been negatively impactful on him."

The court then opened the trial, and heard testimony from the social worker most recently assigned to L.L.'s case, as well as from Father.

After the close of evidence, Father's counsel renewed her request for a continuance to obtain a bonding study. Minor's counsel and counsel for the Agency opposed the request. The juvenile court again denied Father's request for a continuance, determining that a continuance would not be in L.L.'s best interest for two reasons. First, there was no evidence that L.L. had been coached, coerced, or influenced by anyone with respect to his refusal to participate in visits with Father. Second, the record demonstrated that L.L. had a "particular significant detrimental reaction" to having contact with Father.

After hearing closing arguments from counsel, the court found by clear and convincing evidence that it was likely that L.L. would be adopted. The court further determined that Father had met his burden to prove regular visitation and contact with the child because "the standard is for the Court to determine the extent of visitation permitted." Because L.L.'s refusal to visit was not in Father's control, the court concluded that Father had met his burden to demonstrate regular visitation and contact "on these unique facts." However, the court made a finding that Father had not met his burden to prove that he had a substantial, positive, emotional attachment with L.L.

8

Ultimately, the court stated that "overall the trauma [to L.L. from what occurred while he was in Father's care] is so great, the distress so deep that this child feels, that it is a matter of trust for him," and "he does not feel that he can place trust in his father for maybe a great deal of reasons." Finally, the court determined that Father also failed to meet his burden to prove that terminating Father's parental rights would be detrimental to L.L. when balanced against the benefits to L.L. of adoption.[3]

The court terminated parental rights and concluded that a permanent plan of adoption would best serve L.L.'s interests.

Father timely appealed from the trial court's order terminating his parental rights.

### III.

### DISCUSSION

A.  *The trial court's denial of a continuance to allow Father to obtain a bonding study was neither an abuse of the court's discretion nor a due process violation*

Father asserts that the juvenile court abused its discretion in denying his request for a continuance to allow him to obtain a bonding study and that the denial of the continuance for a bonding study violated his due process rights. We disagree.

The law is clear that a juvenile court has no statutory obligation to order a bonding study. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339–1340 (*Lorenzo C.*).) Rather, a court has *discretion* to order or deny a bonding study, and the standard of review applicable to challenge a court's denial of a request for a bonding study is "whether, under all the evidence viewed in a

---

[3]  The court also concluded that the sibling exception to adoption did not apply.

light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*Id.* at p. 1341.)

When a parent's request for a bonding study also involves a request for a continuance of the proceeding, that request implicates an additional set of concerns, in that "[c]ontinuances are discouraged in dependency cases." (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604.) Typically, a juvenile court may grant a continuance in a dependency case only upon a showing of good cause, and a court may not grant a continuance that would cause a hearing to occur beyond an otherwise required time limit if the continuance would be contrary to a minor's interest. (§ 352, subd. (a)(1).) In considering the minor's interests, the court must give "substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*Ibid.*) A trial court's decision to grant or deny a continuance, similar to a court's decision to grant or deny a request for a bonding study, "is a decision reviewed for abuse of discretion, a deferential standard." (*Michael G. v. Superior Court of Orange County* (2023) 14 Cal.5th 609, 637.) A court abuses its discretion only when " ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641 (*Caden C.*).)

Due process in the context of dependency proceedings generally includes the right to notice and the right to a meaningful opportunity to be heard. (*In re R.F.* (2021) 71 Cal.App.5th 459, 470.) Thus, "[w]hile it is not beyond the juvenile court's discretion to order a bonding study" even after the termination of reunification services in situations in which "compelling circumstances" counsel in favor of such a choice, a court's "denial of a belated

10

request for such a study is fully consistent with the scheme of the dependency statutes, and with due process." (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197; see *In re M.M.* (2022) 81 Cal.App.5th 61, 69 (*M.M.*).)

In this instance, Father did not seek the opportunity to obtain a bonding study in the time between the court's termination of Father's reunification services, which occurred in January 2022, and the setting of the section 366.26 hearing. Father also said nothing about a bonding study during his telephonic appearance, while represented by counsel, at the initial section 366.26 hearing in October 2022; at that hearing, the court made a finding that notice had been "given as required by law" and continued the matter for two weeks to permit the Agency to prepare and file its section 366.26 report. Before the hearing concluded for the day, however, the court permitted Father's attorney to argue issues related to Father's visitation with L.L. Father's attorney sought to have the court "reiterate the current visitation order," and mentioned Father had not seen L.L. "since August." Counsel noted that Father had been told that there had been a "gap between visits due to some contract changes between [the supervised visitation center] and the Agency," and counsel represented that the "gap has resulted in [L.L.] now being resistant towards visits." Father's counsel mentioned nothing about a bonding study.

Nor did Father raise or request a bonding study on the record at the continued hearing that occurred in November 2022.

Rather, on the date of the contested section 366.26 hearing in January 2023, Father's attorney raised the issue of her desire to "use a bonding expert for trial" and only then did Father request a two-month continuance. At that time, Father's attorney did indicate, however, that she had raised the issue of a bonding study at an earlier point in time, saying, "At the original .26

11

hearing where I set this for trial, I did inform the Court that I wished to use a bonding expert for trial. And I asked again that the Agency be directed to follow the Court's order and produce the child for visitation." The transcript from the November 2022 hearing at which both parents requested a contested section 366.26 hearing does not include any mention of either party's desire to obtain a "bonding expert for trial"; however, the juvenile court did make reference to an unreported "chamber's conference" that apparently occurred before the hearing, so it is possible that counsel did make some mention of the desire to obtain a "bonding expert" during the unreported conference. In any case, whether or not counsel mentioned wanting to obtain a bonding study for the future contested hearing during an unreported conference, Father had two additional months during which to obtain such a study or seek court assistance with respect to procuring one, yet he did not do so.

Instead, Father waited until the date that the contested section 366.26 hearing was set to begin to request a further continuance for the purpose of obtaining a bonding study. The trial court acted well within its discretion in denying the request. Father's reunification services had already been terminated for almost a year at that point, and the section 366.26 hearing was ready to commence. By this time, the focus of the case was no longer Father's interest in maintaining the care, custody and companionship of L.L., but was instead L.L.'s interest in permanency and stability. (See, e.g., *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [at the point where reunification services have been terminated and a section 366.26 hearing has been set, a parent's "interests in the care, custody and companionship of the child are no longer paramount", and instead " 'the focus shifts to the needs of the child for permanency and stability' "].) L.L. was thriving in the care of his paternal

12

grandmother, and he had been actively rejecting any visitation with Father for many months. Given the history of this case, as well as the clear benefit to L.L. from not further delaying his adoption by the caregiver who had been providing him with companionship and care, we see no abuse in the court's decision to deny a two-month continuance for the purpose of conducting a bonding study at this point in the proceedings.

We also reject Father's contention that the court's decision to deny a continuance for this purpose amounted to a due process violation. This was a belated request for additional time to conduct a bonding study. Father was provided notice of all of the proceedings and was also provided multiple opportunities to be heard. Importantly, Father was not *entitled to* a bonding study at any point in the proceedings (*Lorenzo C., supra*, 54 Cal.App.4th at p. 1339 ["[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights]. Although the Supreme Court has recently noted that "where requested and appropriate," a trial court should "seriously consider . . . allowing for a bonding study or other relevant expert testimony" (*Caden C., supra,* 11 Cal.5th at p. 633, fn. 4), the court's phrasing acknowledges the discretion conferred on trial courts to determine when a bonding study would be "appropriate" and implicitly reaffirms that a parent is not entitled to a bonding study as a matter of right. We therefore reject Father's suggestion that the trial court deprived him of the opportunity to present a defense by not granting him a continuance in order to obtain a bonding study. Consequently, the court's decision to deny a continuance in this case did not amount to a violation to Father's right to due process. (See *M.M., supra,* 81 Cal.App.5th at p. 69 [rejecting argument that denial of continuance for bonding study violated parent's right to due process].)

13

B.    *There is no basis for reversing the trial court's order based on failures in the duty of initial inquiry for purposes of ICWA*

Father also challenges whether the Agency and the juvenile court complied with the initial inquiry duty in connection with ICWA. Specifically, Father argues that "[t]he Agency could have, and should have, inquired with Mother and any known maternal relatives," but the record does not disclose that such inquiries were made.

In dependency proceedings, the juvenile court and the Agency have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a).) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

Section 224.2, subdivision (a) imposes on "[t]he court, county welfare department, and the probation department . . . an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300, 601, or 602 may be or has been filed, is or may be an Indian child." The Agency is required to ask "the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child" upon the initial contact with the Agency. (§ 224.2, subd. (a).) In addition, state law requires the court to pursue an inquiry "[a]t the first appearance in court of each party" by asking "each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child." (§ 224.2, subd. (c); see *In re Ricky R.* (2022) 82 Cal.App.5th 671, 678–679 (*Ricky R.*) [explaining that "[f]ederal regulations require state courts to ask each participant 'at the commencement' of a child custody proceeding 'whether the participant knows or has reason to know that the child is an

14

Indian child' "].)  Moreover, in the circumstance in which a child is taken into temporary custody pursuant to section 306, the Agency must also ask the child, parents, legal guardian, *extended family members*, and others who have an interest in the child whether the child is or may be an Indian child. (§ 224.2, subd. (b); see *In re Robert F.* (2023) 90 Cal.App.5th 492, 500 (*Robert F.*) [duty to inquire of extended family members under § 224.2, subd. (b) is triggered when the child is taken into temporary emergency custody under § 306].)

"On appeal, we review a juvenile court's ICWA findings for substantial evidence."  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051 (*D.S.*).)  However, where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied.  (*Ibid.*)

Father notes that the Agency had been unable to locate Mother until the end of September 2020.  He further contends that the trial court found at the six-month review hearing on May 24, 2021, that notice under ICWA was not required because the court knew L.L. was not an Indian child and that reasonable inquiry had been made to determine whether L.L. may be an Indian child.  The court made this finding, Father argues, despite an absence of information in the record to support a determination that the Agency or the court ever made an inquiry of Mother upon her appearance in this proceeding as to her possible Native American Indian heritage or whether she knew or had reason to know that L.L. has Indian heritage.  Father also notes that at none of the hearings during which Mother was present, either in person or by telephone, did the court inquire of her or her attorney with respect to possible Indian ancestry.  Accordingly, Father contends that at the time the court made a finding that ICWA does not apply to this matter at the section 366.26 hearing on January 6, 2023, the court "did not have sufficient

15

evidence this was true, due to the lack of proper inquiry with Mother or maternal relatives."

As an initial matter, we reject Father's contention that the Agency failed in its duty of initial inquiry with respect to L.L.'s maternal relatives. The Agency argues that it was under no obligation under section 224.2, subdivision (b) to interview or inquire with extended family members such as the "maternal relatives" Father mentions. As the *Robert F.* court recently explained, the plain language of subdivision (b) of section 224.2 requires inquiry of extended family members *only* when a child has been removed under section 306 (*Robert F., supra*, 90 Cal.App.5th at p. 500). This record does not disclose that L.L. was removed pursuant to the emergency removal procedures outlined in section 306. We agree with the *Robert F.* court's analysis and adopt it here.

However, the Agency concedes error with respect to the fact that the Agency and the juvenile court failed in their duty of initial inquiry as to Mother. The record demonstrates that at the outset of this case, Mother did not appear and the Agency was unable to locate her for a period of time. The Agency located Mother as of late September 2020. The record demonstrates that when Mother was first contacted in September 2020, the Agency failed to inquire of Mother as to whether there was reason to believe that L.L. is an Indian child; the Agency's reports from that time frame do not indicate that the Agency made any ICWA inquiries of Mother, despite the requirement of initial inquiry under section 224.2, subdivision (a). The record also indicates that the juvenile court did not make any ICWA inquiry of Mother at her initial appearance, in violation of the requirement of section 224.2, subdivision (c) that the court "ask each participant [at the party's first appearance in court] whether the participant knows or has reason to know

16

that the child is an Indian child." The record also does not disclose that the court made any ICWA inquiry of Mother during subsequent proceedings.

The Agency contends, however, that under the unique circumstances of this case, the error with respect to the initial inquiry as to Mother was harmless. The standard by which an error in ICWA inquiry is assessed for harmlessness is currently the subject of a split of authority among the courts (see *In re K.H.* (2022) 84 Cal.App.5th 566, 611–618.) [summarizing varied approaches to prejudice review in context of ICWA inquiry or notice error]), and the Supreme Court has granted review on the issue (see *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted September 21, 2022, S275578). This division, however, has adopted the approach articulated in *In re Benjamin M.* (2021) 70 Cal.App.5th 735 (*Benjamin M.*). (*In re Y.M.* (2022) 82 Cal.App.5th 901, 916 (*Y.M.*).) Under this approach, "a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.,* at p. 744.)

Although we do not take lightly the question of harmlessness in the context of errors in ICWA inquiry, we agree with the Agency that this unique record establishes that any failure on the part of the Agency and the court to inquire of Mother at the outset of her appearance in the case regarding her or L.L.'s possible Native American Indian Heritage was harmless. Specifically, this record demonstrates that there was *not* any missing but "readily obtainable information that was likely to bear meaningfully upon whether" (*Benjamin M., supra*, 70 Cal.App.5th at p. 744) L.L. is an Indian child that could have come from Mother. First, even before the Agency located Mother, the record in this case demonstrated that Mother had previously reported

that she has no known Native American Indian heritage, and that Mother previously had a court finding that she did not have Native American Indian ancestry. Second, the Agency ultimately did inquire of Mother regarding L.L.'s possible Native American Indian ancestry. Specifically, in March 2021, a social worker asked Mother about possible Native American Indian ancestry. Mother "denied having any Native American ancestry," and also denied that L.L. had any Native American Indian ancestry.

Thus, although the main concern when an Agency or court has failed to conduct the proper initial inquiry and make the information gathered from such inquiry known is that it is generally impossible to know what the inquiry might reveal (see *Benjamin M., supra*, 70 Cal.App.5th at pp. 742–743), it is not impossible to know what a first contact/first appearance inquiry would have revealed in this case. Mother denied Native American Indian heritage before her appearance in this matter. Mother also denied such heritage six months after she first appeared in the proceeding. There is no reasonable possibility that Mother would have provided a different answer if she had been asked these same questions when she was first located and interviewed and at her first appearance in court. It would be pointless for us to remand the matter for the Agency and the trial court to conduct an inquiry of Mother that has now been conducted. Consequently, we conclude that the ICWA inquiry error about which Father complains was harmless and does not require reversal.

## DISPOSITION

The juvenile court's January 6, 2023 order is affirmed.


BUCHANAN, J.

WE CONCUR:


DATO, Acting P. J.


CASTILLO, J.