Filed 1/14/15  In re Tara R. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re TARA R., a Person Coming Under the Juvenile Court Law. | B256027 |
| | (Los Angeles County Super. Ct. No. CK72105) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| STEWART R., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Teresa Sullivan, Judge.  Affirmed.

Law Office of Robert McLaughlin and Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel for Plaintiff and Respondent.

Stewart R. (father) appeals from a judgment of the juvenile court, challenging the court's jurisdictional and dispositional orders regarding his minor daughter Tara R. (Tara). He contends that the jurisdictional findings as to him were unsupported by substantial evidence and that the court failed to make required findings at disposition. We find no merit to father's contentions and affirm the judgment.

## BACKGROUND

On September 3, 2013, the Department of Children and Family Services (the Department) filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b),[1] to bring 15-year-old Tara within the jurisdiction of the juvenile court, and Tara was detained the same day. The petition alleged in counts a-1 and b-1 that father had physically abused Tara by choking her with a purse strap; that such physical abuse was excessive and caused Tara unreasonable pain and suffering; that Tara was afraid of father because of the abuse and did not wish to reside with him; and that the abuse endangered Tara's physical health and safety and placed her at risk of physical harm. Count b-2, later stricken by the court, alleged medical neglect by father. Count b-3 as later amended by the court to delete mention of father, alleged that Tara's mother C.R. (mother) was unable to provide appropriate parental care and supervision of Tara due to the child's mental and emotional problems; that Tara did not wish to reside with mother; and that mother's inability to provide appropriate parental care and supervision endangered Tara's physical health and placed her at risk of physical harm.

Tara and her three now adult sisters, Tiffany, Brittany, and Misty, first came to the attention of the Department more than 10 years ago during a time of family turbulence caused in part by parents' divorce. Several referrals in 2003 were investigated and found to be unsubstantiated or unfounded. In August 2004, a substantiated referral resulted in a voluntary family reunification case from September 2004 to June 2005. At that time, the Department received information that Tara's older sister Tiffany had been physically abused by father, who dragged her by the hair, carried her over his shoulder, threw her

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

onto a cement floor several times, causing her to hit her head and lose consciousness, twisted her arm while threatening to break it, and then threw her into a motorcycle, causing cuts, bruises and head pain. The Department then investigated another substantiated referral and several unfounded, inconclusive, or unsubstantiated referrals between 2005 and 2013. A substantiated referral occurred in 2007, when Tiffany and father engaged in a physical altercation after Tiffany refused to go to school.

In 2008, the juvenile court sustained a dependency petition regarding Tara and Brittany. The petition alleged that mother and father had created a detrimental home environment by emotionally abusing the children and engaging in inappropriate discipline, resulting in severe anxiety, depression, withdrawal, and aggressive behavior on the children's part. Jurisdiction was later terminated in that case with the filing of a family law order which included an order that Tara remain in mother's custody.

The Department received another referral in March 2013, with allegations that Tara had posted a video on YouTube expressing suicidal thoughts and retaliation by mother when Tara visited father. At the time, Tara denied both allegations, and mother agreed to voluntary services to address concerns regarding Tara's mental health.[2] In August 2013, mother called the Department social worker (CSW) to report that Tara was very depressed and had been acting out, and to suggest that Tara be placed in foster care. Tara told the CSW that she did not think her mother cared about her, because mother became angry when she told her therapist how she felt about mother; but Tara said she did not want to live with father, "because all the allegations of physical abuse by him were true."

The Department held a Team Decision Making meeting (TDM) in an effort to resolve the issues. Tara expressed that she did not wish to live with either parent, and that the constant turmoil between mother and her was causing her to be depressed. Father mostly brought up past issues and cases and became so belligerent when asked to focus on current issues, that he was asked to leave the meeting. The remaining parties then

---

[2] Tara later told the CSW that she posted the YouTube video the year before.

agreed on a plan for Tara to continue with counseling and to live with mother for another month, with additional services to help them deal with their issues with each other.

One week later, mother again contacted the CSW to report that she and Tara were not getting along and that Tara was "bad mouthing" her to friends on the telephone. Mother also reported that Tara became enraged and hysterical when mother sold her cell phone to reimburse herself for $400 she accused Tara of stealing several months before, and that Tara prevented mother from leaving for work. A neighbor called 911 when he heard Tara say that she wanted to die. Responding Sheriff's deputies saw broken objects and a knife on the floor, and mother showed them a letter Tara had written about wanting to hurt herself. The deputies then had Tara taken to the hospital for a mental health hold.

A few days later, when Tara was due for release from the hospital, Misty offered to care for her, but mother refused consent and told the CSW to place Tara in foster care. Father told the CSW that mother asked him to pick up Tara from the hospital, and that he would inform the hospital, but he failed to do so. Tara became upset at this and told the CSW she would not go with father, that she was afraid to be alone with him because he always twisted events, and because the last time she was alone with him he choked her with her purse strap. Mother again told the CSW that Tara should go into foster care. Tara became even more upset and said she would hurt herself if placed in foster care, so her doctor decided to keep her in the hospital another night. The CSW then took Tara into protective custody, placed her with friends, and commenced the current dependency proceedings.

The Department's jurisdiction/disposition report included some of Tara's Twitter posts and an undated letter ostensibly written by Tara, expressing her sadness and anger toward her mother. Among Tara's "tweets" in July and August 2013 were statements that that she wanted to kill her mom, that one day she would kill her mom, and that one day she would kill some someone and then "cry for hours." The report also included Tara's account of the choking incident. Tara said that father was supposed to take her home, but instead drove to Acton, where he stopped in a place with no light or signal, yelled at her when she screamed and pushed and kicked the car door; then he grabbed her

4

purse, causing the strap to choke her, and tried to grab her to keep her in the car. Tara told father to stop, and when he did, she got out of the car and he drove off. By the time he returned five minutes later, she was so scared that she had trouble breathing, so he gave her oxygen from her grandfather's tank. When father took her to meet mother, Tara and mother went to the police, who found no choke marks and did nothing.

Prior to the first date set for the jurisdictional hearing, mother signed a trial waiver and a waiver of family reunification services. The court scheduled a contested hearing for father, which began on December 17, 2013, and continued to March 18, 2014. Prior to the December hearing, father telephoned the Department dependency investigator (DI) asking to bring in past court papers that would establish his innocence. For about 15 minutes, father explained his position in rapid, disorganized speech which included claims that mother was a liar, had fabricated stories, that her family law attorney had kicked him, that the children were detained in 2006 because mother had tied them up and sat on them, that everyone was acting on mother's wishes, including foster mother, whom father described as mother's "twin" and "buddy buddies" with her.[3] Father said that mother had taught the caregiver to be manipulative, and he complained that the CSW was biased and rude to him.

At the continued hearing in March 2014, Tara testified regarding the 2012 choking incident. She had been with Brittany, Misty, and father at her grandfather's home one evening during the Christmas holidays. Tara had come to the family gathering with her sisters and left about 8:00 p.m. with father and Brittany. Mother had agreed to meet them at a fast food restaurant and Tara telephoned mother from Valencia to say they were on their way. However, once there, father did not stop, but kept driving to Acton in order to drop Brittany at her boyfriend's home. Tara attempted to leave the car when Brittany got out, and while Tara was half in the car and half out, father sped off and drove to a dark, secluded road in Acton. Tara tried to call mother but there was no cell phone signal. She

---

[3]     The foster mother, who was not mother's friend, but the mother of Tara's friend, told the CSW that she and mother did not speak. The DI believed the caregiver to be neutral and not influenced by either parent.

was crying and having difficulty breathing, so she asked father to pull over so that she could get out of the car.  Father pulled over, and as Tara was getting out of the car, father took hold of the purse strap that was over her left shoulder, circling her body, with the purse on her right hip.  Father pulled on the strap, which applied pressure to Tara's neck until it broke.  She then got out of the car and father drove away.  Tara got back into the car when father returned, because it was late, she was alone, and there was no phone service.  When she began to hyperventilate, father gave her oxygen so that she would not pass out.  Father then drove to the agreed meeting place where mother was waiting.

Tara testified that her parents had initially shared custody of her, but by the time of the hearing, she had visits with father only once every three months.  Tara was afraid of her father and did not trust him because of past physical abuse, and it frustrated her that he would not stop talking about court proceedings.  Although she did not want to be alone with him, she had wanted to go on a trip to Texas with father and her sisters; but now she did not want to see him or have a relationship with him at all.

Tara wanted to continue to see her mother.  She denied that she was afraid of her mother, that mother coached her to claim that father abused her, or that mother ever tried to stop her from seeing father.  In August 2013, it was the family and court situation that caused her to become depressed and to have suicidal thoughts.  Mother told Tara that she was bipolar and needed medication, but Tara was not diagnosed with bipolar disorder or prescribed any medication.  Tara denied that she had a knife the day she was hospitalized; however, she agreed that the hospitalization was appropriate due to her depression, and she thought that it helped.

Father testified that the allegation that he had choked Tara with a purse strap was a "falsehood."  He testified that when they left the family gathering, they intended to go to see a Christmas light display, but Tara took a phone call in the car, "went into a freaky mode," and said, "I got to go.  You got to go take me to Mom."  He assumed that mother was on the phone because of Tara's "freaky" demeanor.  When Tara told him that mother was 15 to 20 minutes away from their originally agreed-upon meeting place, he told her

6

he would drop Brittany off and then go back to the meeting place. Tara lost control and began hitting him on the head from the back seat.

Father continued driving, dropped off Brittany, and started back toward the meeting place. He did not think he should take the freeway due to Tara's behavior, so he took another route. Halfway there, Tara told him to "stop, stop, stop," and he pulled over when he could. Tara got out, closed the door, opened it again to release something in the door, and then closed it again; he assumed that her purse strap or a sleeve had been caught in the door. Father denied that he grabbed Tara's purse or pulled on anything that Tara was wearing that night. He could not remember whether he reached back, but explained that if he did, it was to protect her, and only because he was afraid that she would get out of the car while cars were passing by at 60 to 80 miles per hour. Also, he did not want to leave her on a dark highway.

Father claimed that he drove about one hundred feet to the end of the turn-out and waited for about 45 seconds, thinking that Tara would calm down and come back to the car. When he saw her approaching, he drove closer to her, and saw that she was hyperventilating. She was panting when she got into the back seat, so he gave her some of his dad's oxygen. After a few breaths of it, she was fine. As he drove the rest of the way to the meeting place, Tara was "like an angel" and "never said a word." Mother was there to meet her when he dropped her off.

Father testified that he was in Texas when Tara called to say she had been hospitalized. She was crying, said that mother had put her away so she could not go with him. He was back in California the next time he heard from Tara. She called and asked him to pick her up, but he said that it was "too dangerous" for him to be with her if mother was still able to call her. Father testified that his visits with Tara were regular until she was injured in December 2013,[4] that they were good visits, and that Tara had

---

[4] Tara fell off a tractor or off-road vehicle in November 2013 and fractured her clavicle.

never said she was afraid of him or did not want to see him. Father wanted to have a relationship with his daughter "more than anything."

After hearing the argument of counsel, the juvenile court stated that it had considered all the evidence and testimony admitted in the case, found Tara's testimony to be credible, and found that father deeply wanted a relationship with his daughter and had fought diligently to maintain contact in the face of many obstacles. Based on a preponderance of the evidence, the court found counts a-1 and b-1 of the petition true, struck count b-2, and after deleting father from count b-3, found that count true as to mother.

The court allowed father to make a statement for purposes of disposition, and father asked the court to look at the records of the criminal case from 2006 to 2009 involving mother's former attorney, apparently for the purpose of blaming the dependency proceedings on the former attorney. The court then declared Tara a dependent child of the court, made dispositional findings, and removed her from the custody of mother and father. The court ordered reunification services including referrals for counseling and medical treatment, ordered father to participate in counseling, parenting, and anger management programs, and ordered monitored visits in the presence of a therapist. Father filed a timely notice of appeal from the judgment.

## DISCUSSION

### I. Jurisdiction

Father contends that the jurisdictional findings against him were not supported by substantial evidence. He understands that the unchallenged findings as to mother are sufficient to support dependency jurisdiction (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397), but asks that we reach his contention because the court's dispositional order was based upon the findings against him, and he is also challenging that order. "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could

8

have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.) We exercise our discretion here to consider the merits of father's challenge.

We review the evidence supporting the jurisdictional findings and disposition for substantial evidence, contradicted or uncontradicted, in the light most favorable to the juvenile court's orders; we do not reweigh the evidence, but draw all reasonable inferences from it, accepting the juvenile court's resolution of factual conflicts and issues of credibility. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

The juvenile court sustained the petition under section 300, subdivisions (a) and (b). Under subdivision (a), a child comes within the jurisdiction of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." Section 300, subdivision (b), provides for jurisdiction when the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left."

Father contends that the evidence failed to show that he inflicted harm on Tara nonaccidentally, that she suffered serious physical harm during the choking incident, or that there was a substantial risk of future harm to Tara. Where more than one basis for jurisdiction is alleged, we need substantial evidence to support the findings necessary to sustain just one of them. (*In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045.) We agree with respondent that regardless of whether Tara's injuries meet any legal definition of serious physical harm, substantial evidence supported a finding of a substantial risk of serious future injury.

"The child need not have been actually harmed in order for the court to assume jurisdiction. [Citation.]" (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598.) "Although section 300 generally requires proof the child is subject to the defined risk of

9

harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation]." (*In re Christopher R*. (2014) 225 Cal.App.4th 1210, 1215-1216.) "[A] court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent . . . which indicate the child is at risk of serious physical harm." (§ 300, subd. (a).)

Before any discussion of the legal issues raised in father's arguments, we begin by rejecting father's incomplete and argumentative summary of the evidence, taken mostly from his own testimony and the inferences he has drawn from other evidence. For example, citing his own testimony and the jurisdiction/disposition report for proof of his reason for grabbing the purse, father argues that the evidence showed he grabbed Tara's purse to prevent her from leaving the car because he did not want to leave her stranded in the middle of nowhere. There was no direct evidence of father's intent. Father did not testify to his actual intent, only what it might have been if he had pulled on the purse. He denied pulling on Tara's purse strap altogether, instead suggesting that it was caught in the door. In the jurisdiction/disposition report, the CSW quoted Tara as stating: "[M]y dad grabbed my purse and started choking me. He was trying to grab *me* to keep me inside the car and I told him to stop choking me . . . ." (Italics added.) Thus, any speculation by Tara as to father's intent did not pertain to his grabbing the purse, but to father's attempt to grab *her*.

In an apparent effort to show that he did not want to strand Tara, father also argues that the evidence demonstrated that after she exited the car, he "briefly drove away" and returned "shortly thereafter." We must draw every reasonable inference in favor of the juvenile court's findings and reject father's conflicting inferences. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) Tara's testimony and her statement to the CSW contradict father's perspective. According to Tara, after father drove away, she was left alone in that dark, secluded place with no phone reception for five minutes, long enough

10

to frighten her so much that she had trouble breathing to the point of nearly passing out. Considering this behavior along with father's driving off earlier with Tara still half out of the car, the circumstances of that evening give rise to the reasonable inference that father acted out of anger, not a concern for Tara's well-being. We thus accept that inference and reject father's claim that he acted to prevent Tara from leaving the car because he did not want to leave her stranded in the middle of nowhere. We also agree with respondent that father's behavior was violent, and that violent behavior in the child's presence, particularly in a moving vehicle, supports a finding under section 300, subdivision (a). (Cf. *In re Giovanni F., supra*, 184 Cal.App.4th at pp. 597-598 [domestic violence in car].)

Father contends that the choking incident amounted to a single episode of endangering conduct that was too remote in time to support a finding of current risk. Neither contention has merit. Past events may be considered in assessing current risk that a parent will inflict a nonaccidental serious injury. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) A violent incident occurring within two years prior to the initiation of dependency proceedings cannot be ignored, particularly when viewed in context of other factors. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1439; see § 300, subd. (a) [combination of factors may be considered].) Here, the choking incident occurred about nine months before Tara was detained and while visitation was monitored. Since then, as father has had no opportunity to harm Tara physically, it cannot be said that the risk has dissipated. Further, more than one year after the choking incident and six months after the filing of the dependency petition, father had not taken any measures to address his behavior, but instead continued to blame the circumstances on others: mother; mother's former attorney; the CSW; and Tara's caregiver. Moreover, to characterize the events of that evening as a single episode ignores not only father's past physical abuse of Tara's sister Tiffany, but also the fact that the choking incident itself was not an isolated act of abuse, but one in a series of three such acts, each separated by sufficient time for reflection: driving off with Tara partially out of the car; choking her with the purse strap;

11

and leaving her for up to five minutes in a dark, isolated spot with no cell phone reception.

We conclude that the Department's reports and Tara's testimony provided substantial evidence of father's behavior as alleged in the petition and sufficiently supported the court's jurisdictional findings.

## II. Disposition

Father contends that because the jurisdictional finding with respect to him was not supported by substantial evidence, the dispositional order should be stricken. As we have found substantial evidence supported jurisdiction, father's contention is without merit.

Father also contends that because he was the noncustodial parent at the time the petition was filed, the juvenile court should have considered placing Tara with him unless the court first made the detriment finding under section 361.2, subdivision (a). He contends that removing Tara from his custody under section 361, subdivision (c), was unauthorized. The court heard and rejected father's request for custody. In making its dispositional order, the court stated: "I do find by clear and convincing evidence, pursuant to [section 361, subdivision] (c), there is a substantial danger if the child is returned home to the physical health, safety, protection, physical or emotional well being of the child, and there are no reasonable means by which the child's physical health can be protected without removing her from the parents' physical custody."

Under section 361.2, subdivision (a), "[w]hen a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

12

The juvenile court found that Tara resided with both parents when the petition was filed and were thus both custodial parents.[5]  Mother objected and the court found that mother was a noncustodial parent who did not seek custody.  Father did not object; thus the court's detriment finding under section 361, subdivision (c), pertained only to father.  As respondent observes, if the court erred, any error was harmless.  The court found by clear and convincing evidence that father's physical custody presented a substantial danger to Tara's physical health, safety, protection, physical or emotional well being.  There is no substantive difference between that finding and a finding under section 361.2, subdivision (a), that placement with father "would be detrimental to the safety, protection, or physical or emotional well-being of the child."  As the court's findings are supported by substantial evidence of father's physical abuse, it is not reasonably probable that father would have obtained a more favorable result had the juvenile court expressly made its dispositional finding under section 361.2 instead of section 361.  Under such circumstances, reversal is unwarranted.  (*In re D'Anthony D*. (2014) 230 Cal.App.4th 292, 302-304.)

**DISPOSITION**

The judgment of the juvenile court is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                                                              CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT

_____

[5]      Father was in fact a custodial parent, as he and mother had joint custody of Tara; however, she resided with mother and consented to visit father only occasionally.

13