Filed 8/5/25  In re Ali K. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ALI K. et al., Persons Coming Under the Juvenile Court Law. | B339925 (Los Angeles County Super. Ct. No. 24CCJP01368 D-E) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. DONALD K., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anabelle G. Cortez, Judge.  Affirmed.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Law Office of Amir Pichvai and Amir Pichvai for Plaintiff and Respondent.

_____

Donald K. (Father) appeals from the jurisdiction findings and disposition order declaring seven-year-old Ali K. and five-year-old Cairo K. dependents of the juvenile court under Welfare and Institutions Code section 300, subdivisions (a) and (b)(1),[1] after the court sustained findings that Father and the children's mother, Brittany Brooks (Mother), had a history of domestic violence; Father threatened Mother with a gun; and Father removed the children from school, leading to a child abduction alert and police pursuit. On appeal, Father contends the jurisdiction findings were not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Referral, Investigation, and Petition*

On April 10, 2024 the Los Angeles County Department of Children and Family Services (Department) received an immediate response referral stating the prior day the Los Angeles Police Department (LAPD) had arrested Father for kidnapping Ali and Cairo. According to the referral, Father removed Ali and Cairo from their school around 10:00 on the morning of April 9. Father later called Mother and said he planned to shoot her, the children, and himself, and an Amber

_____

[1]     Further statutory references are to the Welfare and Institutions Code.

2

alert was issued.  Police officers located Father at a local park, but he drove off with the children and was pursued by police officers for approximately five minutes before surrendering.  The officers deemed Father "mentally unstable," and Father was arrested for kidnapping.  Mother reported that the previous night Father had come to Mother's home, pulled out a gun, and made threatening statements that he would harm himself or Mother.

On April 9 a social worker interviewed Mother at the police station.  Mother stated she had been in a relationship with Father for 12 years, although she and Father never legally married, and they had been separated for about a year.  Mother lived with Ali and Cairo and four of Mother's children from previous relationships: 17-year-old Heaven R., 16-year-old Jordan R., 14-year-old Joshua R., and 13-year-old Tamar A.

Mother stated that on the evening of April 8, Father came to the family home to speak to her, and Ali and Cairo let him into the house.  After Mother sent the boys upstairs, Father pulled out a gun and placed it on his lap.  Mother called 911 and left the phone on so the dispatcher could hear their conversation.  Father said, "'This could either go good or bad . . . are you fucking with [me]? . . . Why won't you hear my heart out?  I'll blow you and my head off.'"  Mother ended the 911 call because there was no response, and she called Father's sister, Shawanda K.  At some point Father packed up the gun with a bag of clothing and left.

According to Mother, the next morning she dropped off Ali and Cairo at their elementary school.  At about 10:30 a.m. Mother received a call from the school saying Father, appearing lethargic, had picked the boys up early from school.  Mother went to a police station, filed a police report, and was issued an

emergency protective order.[2]  Mother then drove to a local gymnasium parking lot where she felt safe.  The police met her there, and when Father called Mother, she handed the phone to a police officer who advised Father he was being served with a protective order and must return the children.

Mother also told the social worker about two previous incidents of domestic violence involving Father: in February 2023 Father kicked down a door when Mother would not see him, and in September 2023 Father spit on Mother's face and was arrested.  Father was a good father to Ali and Cairo and did not believe in physical discipline.  Father did not drink; he occasionally used marijuana; and he did not have a history of mental health issues.

On April 9 the social worker interviewed Father at the police station.  Father said he and Mother had been having issues with their relationship for a few months due to his infidelity, and he had been lonely after the recent death of his parents and sister.  On April 8 he spent the evening at Mother's house, and "everything was fine."  Mother left the house and sat in her car "thinking"; she returned around midnight.  On the morning of April 9 Father dropped Ali and Cairo off at school and picked them up around noon.  He took them to the store for candy and then to the park, adding he "caused no harm to anyone."  When he called Mother, a police officer got on the phone to inform him about the protective order, and Father told the officer he would not harm anyone.  Father asserted he did not flee the police in the park; rather, he noticed police were following him only after

---

[2]     Mother was not specific as to when in the day she went to the police station.

4

he left the park, and he immediately pulled over. He was not armed. Father denied ever threatening to kill anyone and denied kidnapping the children, stating, "They are my children, how can I kidnap them?" Father also denied that he and Mother had a history of domestic violence, that he used drugs (other than marijuana),[3] and that he had ever physically disciplined the children.

Social workers spoke to all of Mother's children on April 9. The social workers did not observe any signs of physical abuse or neglect on the children. Ali and Cairo stated they lived with both parents and their siblings. Mother and Father took them to school and cared for them after school. Ali reported feeling safe and happy. According to Ali, after school that day Father bought him candy and food and took him to the park, where he played with Cairo and "had fun." Mother told Father to bring him home, but Father wanted to stay in the park. The police found them and took Father to jail. Ali denied being scared of Father and stated he loved him. Cairo likewise felt happy and safe in the home. Cairo similarly stated Father took him to the park to play, and he had fun at the park. Cairo denied being scared of Father. Father was acting normal and did not hurt him or Ali.

Heaven told the social worker that on the night of April 8 she had seen a gun by Father's foot, but Father tried to hide it under the couch when he saw her. She did not hear him threaten Mother or the children. On the morning of April 9 Father called Heaven several times to ask why Mother would not take his calls,

---

[3]   Father submitted to a drug test on April 12, 2024 and tested negative for all substances except marijuana and its metabolites.

and he laughed, cried, laughed, and continued crying while he was on the phone with her. Heaven recalled a previous incident where Father broke down the back door of the home and threw a soda at the window, and another incident where he threatened to "mess up" Mother's car. Mother and Father frequently argued, but Heaven felt safe around Father.

Jordan told the social worker that Mother and Father argued and screamed at each other during their relationship, but Jordan was not aware of any domestic violence between them. He had not been physically disciplined and was "cool" with Father. Jordan was asleep on the evening of April 8 and did not witness anything. Joshua reported that he was not at home on the night of April 8. He never witnessed any domestic violence between Mother and Father, and he was not afraid in the home. Tamar was staying with her grandmother on April 8. She heard Mother and Father argue in the past, but she felt safe in the home and around Father.

LAPD Sergeant Rodriguez and Officer Scott told the social worker that Mother had contacted their police station in the afternoon of April 9 to report Father's threats and the removal of Ali and Cairo from school. Mother reported that Father made threats to kill Mother, the children, and himself. Sergeant Rodriguez met Mother at a gymnasium and spoke to Father on Mother's phone and asked Father to bring the children back to Mother or another family member. Father hung up on Sergeant Rodriguez several times and would then call back crying, screaming, and saying he did not have a gun. Sergeant Rodriguez could hear Ali and Cairo in the background screaming, "'Daddy got us.'" Based on Mother's reports that Father was armed and had threatened her and the children and Father's

6

refusal to return the children, the police issued an Amber alert and used Father's phone to track him to a local park. When police cars arrived at the park, Father got in his vehicle with Ali and Cairo. Police cars and a helicopter followed Father for approximately five minutes before Father pulled over to the side of the street. Officer Scott stated that when Mother contacted the police, she said Father was going to kill Mother, himself, and the children. After Father was located in the park, Father led the officers in a "small pursuit" before pulling over. According to Officer Scott, once Father pulled over, he let Ali and Cairo out of the car and told them to "run away from the police." The officers did not recover any weapons from Father.

Records of the family's prior child welfare history included a September 2023 referral alleging Mother and Father had argued, Father took Ali from the home, and when Mother followed, Father spit in her face and was arrested. The referral was deemed inconclusive, and the children denied witnessing the incident. A 2018 referral (that was also unsubstantiated) alleged that Father told his older children (who lived with their mother, Latausha) that he was going to kill Mother and her then-boyfriend. Latausha reported that Father made similar threats to her during their child custody exchanges, and in 2013 a court issued a five-year domestic violence restraining order protecting Latausha from Father after Father hit and verbally abused Latausha and their children.

On May 1, 2024 the Department filed a petition on behalf of Ali, Cairo, Jordan, Joshua, and Tamar under section 300,

subdivisions (a), (b)(1), and (j).[4]  The petition alleged for each count that Father and Mother had a history of engaging in violent altercations; on April 8, 2024 Father brandished a gun and threatened to shoot Mother while the children were present in the home; and on April 9 Father took Ali and Cairo out of school and threatened to kill Mother and the children, resulting in an Amber alert and Father's arrest for kidnapping.  The parents' history of domestic violence included Father spitting on Mother, breaking a door, and throwing a soda at the window of the children's home.

At the May 15, 2024 detention hearing the juvenile court detained Ali and Cairo from Father and released them to Mother under the Department's supervision.

B.    *The Jurisdiction and Disposition Report and Hearing*

As described in the jurisdiction and disposition report, on June 21, 2024 a social worker interviewed Ali and Cairo in their new home with Mother.  Ali stated that on April 9 Father took him and Cairo to the park, a friend's house, the store, and then to the police station to meet Mother.  Ali reiterated that Father was loving and had not hurt him.  When the social worker asked if Father had a gun, Ali responded, "I can't say.  I don't want to get hurt."  He then clarified that he did not want to say anything because he might get into trouble.  After Mother encouraged Ali to report what he knew, Ali said he saw Father with a gun and had seen bullets in the home.  Ali did not say when he saw the gun.  Ali had seen his parents fighting, and one time Father

---

[4]    Heaven turned 18 in April 2024 and was not included in the petition.  Only Ali and Cairo are at issue in this appeal.

smashed Mother's phone, and Father "broke an Xbox, everything." Cairo did not provide any additional information during his interview with the social worker and "walked out . . . abruptly" after a few minutes.

Mother provided a more detailed (and somewhat different) account of the events of April 8 and 9. Mother stated she came into the house around midnight on April 8, while the children were already asleep upstairs, and Father was in the house holding a silver .38-caliber revolver. She did not know if the gun was loaded. Father said he had questions for her and added, "'This can go well or with one of us leaving in a body bag.'" He asked Mother if she was seeing anyone else and why she would not see him, and Father said, rubbing the gun against his head, "'I can do me and make you suffer or I can do both of us.'" Mother repeated that she had called Shawanda when there was no response from the 911 operator. She told Shawanda, "'He's here with a gun and you have to come get him.'" Shawanda then called Father and "made him leave." Mother collected the children and stayed at a friend's house. The following morning, after dropping the children at school, Mother went to a police station to obtain an emergency protective order. While she was at the police station, the school informed her that Father had taken Ali and Cairo. An Amber alert was issued three hours later, and although Father was arrested, the "charges were dropped because he hadn't even been served with the [protective order] yet." Contrary to her statements in April, Mother told the social worker that Father never threatened the children.

In his follow-up interview, Father denied having a gun, stating, "Did the police find a gun in the house? No, they didn't. Did they find a gun in my car? No. They only found me and two

9

boys, some pizza and candy. So all that stuff is baloney." Asked to explain what happened on April 8, Father said, "It's the same story. Was she harmed? W[ere] the kids harmed? Was I harmed? Next." Father explained the children's school had a short day on Tuesdays, recessing at 1:30 p.m., and sometimes Father would pick the boys up "a little early so I can take them to the park for some father and son time." With respect to the family's history of domestic violence, Father said, "We don't have a history of nothing. She says stuff. I never went to jail for [anything]." As to the September 2023 spitting allegation, Father said he had a "little argument" with Mother and the police came for a welfare check and found everything was fine. After Father went out, Mother "got the police on me saying I spat on her," but they let him go because he was innocent.

Shawanda told the social worker she did not recall talking to Mother or Father on April 8. After further questioning, Shawanda recalled that Mother had called her and had her speak to Father to mediate a relationship dispute, but that had occurred about a week before the kidnapping incident. Shawanda believed Mother made up the allegations against Father because Father had cheated on her, and Mother was "trying to hurt him through the kids."

The Department recommended the petition be sustained as to Father but dismissed as to Mother because she made efforts to protect the children from Father and was cooperating with the Department. The Department also recommended the juvenile court not take jurisdiction over Jordan, Joshua, and Tamar because the Department no longer had concerns about their safety.

10

At the July 18, 2024 jurisdiction and disposition hearing, the juvenile court struck the allegations regarding Jordan, Joshua, and Tamar from the petition. Father's attorney argued all counts should be dismissed because the Department failed to meet its burden to show the children were currently at risk of harm. Father adamantly denied he ever threatened to harm Mother or himself, and there was no evidence he had a gun. Father's attorney argued Mother was not credible, pointing out that Shawanda contradicted Mother's account that she called Shawanda for help on April 8; Ali first disclosed he saw a gun in July 2024 when he was interviewed with Mother, who coached him; and Mother had previously accused other boyfriends of domestic violence but the cases were closed as unfounded (other than Father's 2013 arrest for domestic violence).

Mother's attorney requested the juvenile court strike her from the petition because she had moved with the children to a new location. Her attorney also noted Mother had no motive or reason to lie about what had happened.

Minor's counsel urged the juvenile court to sustain the petition as to Father, noting that Heaven reported Father had a gun; Father's behavior during his April 9 conversation with police officers was "very escalated" and concerning; and Father's flight from police on April 9 involving a chase by police cars and a helicopter endangered Ali and Cairo. Further, Mother's account of the incidents was more credible than Father's, and she did not have a motive to lie.

Following the attorneys' arguments, the juvenile court struck Mother from the petition and dismissed the allegations under section 300, subdivision (j)(1). The court sustained the

11

petition as amended.[5]  The court acknowledged "there is a conflict in the evidence" and Father consistently denied the allegations that he had threatened Mother or had an "ill motive" when he removed Ali and Cairo from school.  The court stated it had evaluated the accounts and statements by Mother, Father, the children, and other "collaterals."  The court found Father's account not credible that he had not threatened Mother on April 8, and that April 9 was just a normal Tuesday.  The court observed that Father did not provide a plausible explanation for his behavior on the afternoon of April 9, as described in the police statements.  Further, the evidence of the parents' history of arguments showed this incident was not a one-time meltdown, and the children's statements provided evidence Father had a gun and had destroyed Mother's property in the past.

The juvenile court declared Ali and Cairo dependents of the court under section 300, subdivisions (a) and (b)(1), and ordered them removed from Father and to remain in Mother's custody with family maintenance services.  The court ordered Father to complete a domestic violence program for perpetrators and individual counseling to address domestic violence, co-parenting, child safety, anger management, and grief.  The court ordered monitored visitation for Father for a minimum of three times per week for three hours each visit.

---

[5]  The juvenile court also struck the allegation in the petition that Father had been arrested and charged with kidnapping, and the allegations relating to Mother's failure to protect the children from Father's conduct.

Father timely appealed.[6]

## DISCUSSION

A.   *Governing Law and Standard of Review*

The juvenile court has jurisdiction over a child if the Department establishes by a preponderance of the evidence that the allegations made pursuant to section 300 are true.  (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).)  Section 300, subdivision (a), provides that jurisdiction may be assumed if "[t]he child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."  "Nonaccidental" generally means a parent or guardian "acted intentionally or willfully."  (*In re R.T.* (2017) 3 Cal.5th 622, 629; accord, *In re Cole L.* (2021) 70 Cal.App.5th 591, 601 (*Cole L.*).)

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child."  (*Cole L., supra*, 70 Cal.App.5th at pp. 601-602; accord, *In re L.O.* (2021) 67 Cal.App.5th 227, 238 ["'Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection.'"]; see *In re*

---

[6]   Father appealed from the juvenile court's July 18, 2024 jurisdiction findings and disposition order, but in his briefing he does not present any arguments as to the disposition order other than that the jurisdiction findings should be reversed.

13

*Giovanni F.* (2010) 184 Cal.App.4th 594, 598 ["The child need not have been actually harmed in order for the court to assume jurisdiction"].) "A parent's '"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'" (*Cole L.*, at p. 602; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.) "'However, '"[t]o establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur."'"'" (*In re Gilberto G.* (2024) 105 Cal.App.5th 52, 62; accord, *Cole L.*, at p. 602.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*I.J., supra*, 56 Cal.4th at p. 773; accord, *In re R.T., supra*, 3 Cal.5th at p. 633; *In re Gilberto G., supra*, Cal.App.5th at p. 62 ["'"We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding."'"].) "'However, [s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.'" (*Cole L., supra*, 70 Cal.App.5th at

14

p. 602; accord, *In re S.F.* (2023) 91 Cal.App.5th 696, 713.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; accord, *In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.)

B.     *Substantial Evidence Supports the Juvenile Court's Finding Ali and Cairo Were at Substantial Risk of Serious Physical Harm*

Father contends there was insufficient evidence to support the juvenile court's finding that Father willfully created a substantial risk of serious physical injury to Ali and Cairo because the court's factual findings were grounded in Mother's inconsistent and unreliable accounts of the April 8 and 9, 2024 incidents.  Substantial evidence supported jurisdiction under section 300, subdivision (a).[7]

---

[7]     Because we conclude substantial evidence supported the juvenile court's jurisdiction finding under section 300, subdivision (a), we do not reach whether the evidence also supports the sustained finding under section 300, subdivision (b)(1).  (See *I.J., supra*, 56 Cal.4th at pp. 773-774 ["'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'"]; *In re M.D.* (2023) 93 Cal.App.5th 836, 852-853 [same].)

15

Mother consistently reported that Father was distraught about their relationship; on the night of August 8 he brandished a gun and threatened to kill her (and/or himself) while Ali and Cairo were upstairs; and on the morning of August 9 he repeated those threats and removed the children from school early, acted erratically, and refused to return them.  Father, in his statements to the social workers, emphatically denied Mother's story and asserted he never had a gun.  In his telling, April 8 was an ordinary night without a serious argument, and April 9 was just a day in the park for "some father and son time."  Father also highlights Mother's inconsistent accounts as to whether Father threatened to kill the children.  According to the referral and Sergeant Rodriguez's statement to the social worker, Mother told police that Father had threatened to kill Ali and Cairo, but in Mother's June 21 statement to the social worker, Mother stated Father never threatened to harm the children.  In sustaining the petition, which expressly alleged threats to kill the children, the juvenile court impliedly found Mother's initial police report was more credible than her later recantation.  Moreover, the court acknowledged the parents' divergent accounts and the inconsistencies in Mother's own accounts but expressly found Father was not credible, and his insistence that nothing happened was irreconcilable with undisputed facts.  We defer to the court's credibility determination.  (*In re I.J., supra*, 56 Cal.4th at p. 773.)

Father also ignores or minimizes the evidence that corroborates Mother's testimony and contradicts his statements.  For example, Heaven—who bore no evident animus toward Father—reported seeing Father with a gun in the home on April 8, which he tried to conceal from her.  And Ali, in his

16

June 21 interview, stated he saw Father's gun and bullets in the home and had been afraid to report it earlier (although the timing is unclear). Although none of the children witnessed Father threaten to kill Mother, himself, or the children, Father called Heaven several times on April 9 in a state of distress, alternating between laughing and crying. Sergeant Rodriguez also spoke with Father on Mother's telephone and reported that Father repeatedly hung up and called back, crying and screaming, and Sergeant Rodriguez could hear Ali and Cairo in the background "screaming 'Daddy got us' and crying." The elementary school told Mother that Father appeared "lethargic" when he removed the children, and the LAPD officers determined he was "mentally unstable."

Most significantly, there was undisputed evidence Father refused to return Ali and Cairo after Sergeant Rodriguez advised him of the protective order and ordered him to bring the boys back. When police officers responded to the park after geolocating Father's phone, Father fled with the boys, and police cars and a helicopter pursued Father's car for five minutes before he pulled over, let the boys out, and surrendered. As the juvenile court found, Father's flight in response to the Amber alert was inconsistent with his position that he had no "ill motive" when he took the children, and it supported a contrary finding that Father acted "'intentionally or willfully'" in creating a threat of physical harm. (*Cole L., supra*, 70 Cal.App.5th at p. 601.)

Substantial evidence also supported the juvenile court's finding there was a history of domestic violence between Mother and Father. In addition to Mother's reports of two prior incidents, Heaven told the social worker that Father previously broke down the back door of the home and threw a soda at the

17

window during an argument with Mother.  Ali stated Father broke Mother's phone during another argument, and Ali and Joshua both stated Father broke their gaming console when he was angry.  The court also cited a history of calls to the police, multiple earlier Department referrals, and Father's arrest in September 2023 for allegedly spitting on Mother as evidence of ongoing "tensions" in the family.  Father argues that none of the minor children was present for any physical violence between the parents, and there was no evidence in the record they were afraid in the home or had suffered physical or emotional abuse.  However, the court relied on both the events of April 8 and 9 and the prior domestic violence to support its jurisdiction findings under section 300, subdivision (a).  The court explained, pointing to the history of domestic violence, that the egregious incident starting on April 8 was not "a one-time incident," and the children were therefore still in danger of serious physical harm.

## DISPOSITION

The jurisdiction findings and disposition order are affirmed.


FEUER, J.

We concur:



SEGAL, Acting P. J.          STONE, J.


18